JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
DORIS A. KAELIN (162069)
JENNY L. FOUNTAIN (226241)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: dkaelin@murraylaw.com
Email: jlfountain@murraylaw.com

Attorneys for Defendant ComUnity Lending, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAI CHRISTINA PHAM, JOHN PHAM, MAI NGUYEN, AND HUNG PERRY NGUYEN<br><br>PLAINTIFFS<br><br>vs.<br><br>COMUNITY LENDING, INCORPORATED, A CALIFORNIA CORPORATION, ETC.<br><br>DEFENDANT. | Case No. C07-05436 JW (HRL)<br><br>Date: December 4, 2007<br>Time: 1:30 p.m.<br>Place: United States District Court<br>       280 S. First Street<br>       San Jose, CA<br>Judge: Honorable James Ware |

## OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

Defendant, ComUnity Lending Incorporated, (the "Defendant", "Company" or "ComUnity") hereby submits its opposition to the APPLICATION FOR WRIT OF ATTACHMENT (the "Application") filed by Plaintiffs Mai Christina Pham, John Pham, Mai Nguyen and Hung Perry Nguyen (the "Plaintiffs") as follows.

### INTRODUCTION

This is an action by several employees for payment of benefits under a non-qualified, unfunded employee retirement benefit program for highly compensated employees. The Plaintiffs contend that the Plan was terminated, that their contributions vested, and that they are entitled to

immediate payment from the plan. Defendant opposes the Application on the grounds that the Plaintiff cannot sustain their burden of showing the probable validity of the claim. The Plan prohibits distribution to employers where the Company is insolvent, the Defendant is unable to pay its debts as they become due and as such, is insolvent as that term is defined under the Plan documents. The Defendant is thus precluded under the terms of the Plan from making distributions to participants and beneficiaries. According, the Application should be denied.

## FACTUAL SUMMARY[1]

### 1. The Employees

Plaintiffs were employed by the Defendant. In September of 2003, the Company established the "ComUnity Lending Inc. Non-Qualified Deferred Compensation Plan" (the "Plan"),[2] a non-qualified, unfunded pension plan intended to provide retirement benefits to certain highly-compensated employees selected by the Board of Directors. The Plaintiffs are all individuals who accepted the Company's invitation to participate in the Plan. All were highly compensated individuals, invited by the Company to participate in the Plan.

### 2. The Plan

Article 1 sets forth the recitals, including a recital that it is the express intent of the Employer[3] that the assets of the Plan and Trust shall at all times be subject to the claims of the general creditors of the Employer.

Article 3 sets forth the Plan Specifications. It provides, *inter alia,* that any salary deferrals made by an Eligible Employee[4] under this Plan shall be held as an asset of the Employer, and the Employer intends to deposit the amounts into the Trust.

Article 4 is entitled "Distributions and Loan" and essentially provides that all distributions to or for the benefit of a Participant shall be made in accordance with Article 8, although this section

---

[1] The factual summary is evidenced by the DECLARATION OF RICHARD G. COUCH IN SUPPORT OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT (the "Couch Declaration") filed concurrently herewith.
[2] The Plan is the second version of the Company's top hat plan, the first version having been established in the 2001/2002 timeframe.
[3] Capitalized terms not defined herein have the same meaning ascribed to them as the Plan.
[4] "Eligible Employee" is defined as a "member who is part of a select group of management or highly compensated individuals who performs services for the Employer as an employee and who has been chosen by the Employer each year, in his sole discretion, to be eligible to participate in the Plan."

also provides for a withdrawal in the case of employee hardship.

Article 5 is entitled "Plan Investment" and provides that all contributions be invested in a mutual fund under which Participant Accounts will be established for each Participant. Section 5.2 provides **that "all amounts under this Plan…shall remain (until made available to the Participant or Beneficiary) solely the property of the Employer (without being restricted to the provision of benefits under the Plan) subject to the claims of the Employer's general creditors. No Participant or Beneficiary shall have any secured or beneficial interest in any property, rights or investments held by the Employer in connection with the Plan."**(Emphasis added).

Section 7.1 provides that the "value of a Participant's Account shall be fully vested at all times subject, however, to the reach of the Employer's creditors in the event of insolvency."

Section 8.13 provides that the benefits under this Plan are immediately payable in a lump sum upon a Plan Termination.

Section 8.14 provides that notwithstanding the distribution provisions of Article 8, the Committee may, in its sole and exclusive discretion, modify payments made pursuant to Article 8.[5]

Article 9 is entitled Administration. Section 9.7 makes it clear that no fiduciary relationship is created between the Employer and any Participant.

Article 10 sets forth miscellaneous provisions. Section 10.6 provides that the "vested **Account balance of a Participant shall be paid from the Trust only to the extent the Employer is not at the time of payment insolvent. Any vested accrued benefits under the Plan represent an unfunded, unsecured promise by the Employer to pay these benefits to the Participants when due**. A Participant has no greater right to Trust assets than the general creditors of the Employer in the event that the Employer shall become insolvent. Trust assets can be used to pay only vested accrued benefits under the Plan or the claims of the Employer's general creditors." (Emphasis added)

3. <u>The Trust Agreement</u>

ComUnity has been unable to locate an executed Trust Agreement and has attached what it

---

[5] "Committee" is not defined in the Plan.

understands to be the form of that agreement as Exhibit C" to the Couch Declaration.

The Trust Agreement identifies Investor's Bank & Trust Company as the Trustee. Section 1(b) provides that this is an irrevocable trust.

Section 3 of the Trust Agreement provides that the trustee will cease payment of benefits if the Employer is insolvent. The Employer is considered insolvent if the (i) Employer is unable to pay its debts as they become due; or (ii) the Employer is a debtor under the bankruptcy code.

Section 3(b) provides that the principal and income of the trust is subject to the claims of general creditors. The Board or CEO shall have the duty to inform the Trustee in writing of the Employer's insolvency. Unless the Trustee has actual knowledge of the insolvency, it has no duty to inquire whether the Employer is insolvent. It may rely on such evidence as may be furnished to the trustee that provides the trustee with a reasonable basis to determine solvency. Thus, notice from the employer of insolvency is not strictly required before the Trustee can cease payments.

Section 3(b)(3) provides that if at any time the Trustee determines that the Employer is insolvent, it shall discontinue payments and shall hold the assets of the trust for the benefit of the Employer's general creditors. Nothing in the trust agreement diminishes the rights of the plan participants to pursue their rights as general creditors.

Sections 10 and 11 cover the removal of and appointment of a successor to the trustee. The Trustee may resign or be removed by 90 days advance notice. If the Trustee resigns or is removed, the Employer may appoint any third party, "such as a bank trust department or other party that may be granted corporate trustee powers under state law, as a successor..."

Section 12(b) provides that the Trust shall not terminate until the date on which plan participants and their beneficiaries are no longer entitled to benefits pursuant to the terms of the plan. Section 13(b) provides that "benefits payable to Plan participants and their beneficiaries under this Trust Agreement may not be ...subjected to attachment, garnishment, levy, execution or other legal or equitable process."

4.    <u>The Company attempts to terminate the Plan.</u>

ComUnity was established in 1980 to originate, broker and sell real estate mortgages. At one point in time, it had over 100 offices and employed over 2000 people. The "sub-prime" mortgage

crisis has befallen the entire industry and ComUnity is now one of the casualties. It faces the prospect of having to repurchase non-performing loans from institutions to which it sold the loans which could result in losses well in excess of $30 million.

The crisis hit in 2007 and has presented ComUnity with an array of issues with which it must deal, including responding to re-purchase demands from investors, interest expenses and other issues, as more fully described in the Couch Declaration. In a meeting of the board of directors of the Company, ComUnity decided in August of 2007 to terminate the Plan and to distribute the funds to the employee participants. ComUnity thereupon sent a written notice to the Plan Administrator, Transamerica Retirement Services, on August 29, 2007. The Company had several communications with the Plan Administrator regarding the logistics of terminating the Plan and of making distributions to the Employees. Satisfied that these concerns were adequately addressed, the Plan Administrator, and the Company notified the Employees of the termination of the Plan in a notice dated September 4, 2007. The Company instructed its employees to submit disbursements requests in a form provided by the Plan Administrator and which completed forms were received by the Company between September 7 and September 29.

The Company submitted the forms to the Plan Administrator which in turn cut checks payable to Com Unity Lending in the amounts attributable to each participant.[6] ComUnity posted the checks to a special, sequestered account in the Company's name (the "Top Hat Funds"). Approximately $227,011, however, representing contributions from four different individuals, including one of the Plaintiffs, was posted to the Company's operating account. Prior to distribution to the Employees, however, ComUnity considered the question as to whether the Company was insolvent and consulted with counsel regarding the propriety of distributing the funds if the Company was insolvent. Given the circumstances, and the express prohibition against paying distributions to participants when the Company was insolvent, ComUnity advised the participants that it could not make the distributions from the Top Hat Funds while it considered the issue.

///

---

[6] To the best of current management's knowledge, this was standard practice. Transamerica would issue checks to ComUnity Lending which in turn would make the distributions to the employee, deducting applicable withholding taxes, among other deductions.

## ARGUMENT

<u>Plaintiffs Are Not Entitled To Be Paid Distributions From The Plan Where The Employer Is Insolvent</u>

The Plan is a so-called "Top Hat" plan. "Top hat" plans are special breed of plans under Employee Retirement Income Security Act of 1974, 29 USCS §§ 1001 et seq., that were excluded from substantive portions of ERISA, pursuant to 29 USCS § 1051(2). Thus, if the plan fits the "top hat" exclusion, ERISA does not impose a trust on the plan's funds, and Bankruptcy Code does not exclude property in "top hat" plan from the debtor employer's bankruptcy estate. *IT Group, Inc. v Bookspan (In re IT Group, Inc.)* 305 BR 402, (Bankr. Del. 2004), affd 323 BR 578, (D. Del .2005), affd 448 F3d 661 (3d Cir. 2006).

ERISA defines a "top hat" plan as a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. 29 U.S.C.S. § 1051(2).

> "When a plan is unfunded, the employer promises to pay the employee the deferred compensation at a specified time but does not set aside the funds in an escrow, trust fund, or otherwise. The assets used to pay the deferred compensation are the general assets of the employer and are subject to the claims of the employer's creditors. An employer may set aside deferred compensation amounts in a segregated fund or trust without jeopardizing a plan's unfunded status if the fund or trust remains subject to the claims of the employer's creditors in the event of insolvency or bankruptcy. One commonly-used mechanism is the rabbi trust, which is an irrevocable trust for deferred compensation. Funds held by the trust are out of reach of the employer but are subject to the claims of the employer's creditors in the event of bankruptcy or insolvency."

*Accardi v. IT Litig. Trust (In re IT Group, Inc.),* 448 F.3d 661 (3d Cir. 2006)

In the *Accardi* case, Plaintiffs, participants in a deferred compensation plan, filed an adversary complaint against defendants, seeking priority status for their claims for benefits owed under the deferred compensation plan. The participants argued that the plan was subject to ERISA's funding and fiduciary requirements and that the corporation had a duty to set aside, in a trust beyond the reach of the creditors, assets sufficient to satisfy the corporation's obligations under the plan. The bankruptcy court dismissed the complaint for failure to state a claim, holding that the plan was exempt from ERISA's substantive provisions because the plan was an unfunded top hat plan within

1   the meaning of 29 U.S.C.S. § 1051(2). Because the participants did not challenge the determination
2   that the plan was offered only to management and highly compensated employees, the only question
3   on appeal was whether the plan was unfunded. The court held that the plan was unfunded because
4   (1) there was no res separate from the corporation's general assets to which the participants could
5   look to satisfy their claims, (2) the participants' rights to the corporation's assets were no greater than
6   the rights of general, unsecured creditors, and (3) the participants did not pay taxes on the deferred
7   compensation.

8         Plaintiffs contend, without authority, that the Company is required to make the distributions
9   from the Plan if the Company was solvent as of the date of the termination of the Plan even if the
10  Company is insolvent at the time of payment.  However, Section 10.6 of the Plan specifically
11  provides that the vested amount shall be paid only to the extent "at the time of payment" the
12  Company is not insolvent.

13        The Couch Declaration demonstrates that the Company is currently unable to pay its debts as
14  they become due.  Further, the adjusted balance sheet as of September 30, 2007 shows that the
15  Companies' liabilities exceed its assets by at least $4 million.  Further, if "off-balance" liabilities are
16  considered, the deficit could be well in excess of $30 million.  Given the circumstances, the
17  Company believes that it was probably insolvent as of the date of the purported termination of the
18  Plan in any event.

19        Plaintiffs are thus not entitled to distributions by the express terms of the Plan.  Instead, the
20  Top Hat Funds are available for general creditors of the Company.  As noted in the Couch
21  Declaration, the Company has new management, brought in by the sole shareholder to assist the
22  Company in dealing with the sub-prime crisis, to identify its assets and liabilities and to administer
23  the Company for the benefit of its creditors.  Even if the Company was solvent at the time of the
24  purported termination of the Plan, the Company believes that it is insolvent as of the present date.
25  Under these circumstances, the Company cannot make any payments from the Top Hat Funds to the
26  Plaintiffs ahead of general creditors of the Company.

27  **CONCLUSION**

28        For the foregoing reasons, Plaintiffs cannot show that their claims are "probably valid".  The

1 | Application for a Writ of Attachment should be denied.

Dated: November 28, 2007     **MURRAY & MURRAY**
A Professional Corporation

By: */s/ Robert A. Franklin*
Robert A. Franklin
Attorneys for Defendant ComUnity Lending, Inc.