JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
DORIS A. KAELIN (162069)
JENNY L. FOUNTAIN (226241)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: jwmurray@murraylaw.com
Email: rfranklin@murraylaw.com
Email: dkaelin@murraylaw.com
Email: jlfountain@murraylaw.com

Attorneys for Defendant ComUnity Lending, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAI CHRISTINA PHAM, JOHN PHAM, MAI NGUYEN, AND HUNG PERRY NGUYEN<br><br>PLAINTIFFS<br><br>vs.<br><br>COMUNITY LENDING, INCORPORATED, A CALIFORNIA CORPORATION, ETC.<br><br>DEFENDANT. | Case No. C07-05436 JW (HRL)<br><br>Date: December 4, 2007<br>Time: 1:30 p.m.<br>Place: United States District Court<br>       280 S. First Street<br>       San Jose, CA<br>Judge: Honorable James Ware |

**DECLARATION OF RICHARD G. COUCH IN SUPPORT OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT**

I, Richard G. Couch, declare:

1.  I am the Chief Executive Officer and Chief Restructuring Officer of the Defendant ComUnity Lending, Incorporated (the "Defendant", "Company" or "ComUnity") and am authorized to make this declaration on its behalf. I have personal knowledge of the facts set forth in this declaration, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called as a witness, I would and could testify to the following.

/ / /

/ / /

2. I am the Chairman and CEO of Diablo Management Group, a business consulting group specializing in corporate and business turnarounds and providing crisis management services to companies in financial trouble. I have over 27 years experience in turnaround management and in the creditor workout industry and have served as a bankruptcy trustee and assignee for benefit of creditors in addition to numerous assignments as an officer and director for troubled companies.

3. On October 25, 2007, I was appointed as Chief Restructuring Officer, Director and Chief Executive Officer of the Defendant by the unanimous written consent of the Company's directors. All other directors and officers of the Company have resigned.

4. ComUnity was established in 1980 to originate, broker and sell real estate mortgages. At one point in time, it had over 100 offices, lended in 44 states and employed over 2,000 people. The "sub-prime" mortgage crisis has befallen the entire industry and ComUnity is now one of the casualties. Issues faced by ComUnity include: i) Repurchase Requests - massive defaults in the subprime and Alt-A loan markets, which triggered Investor re-purchase demands for ComUnity to re-purchase non-performing loans, resulting in financial obligations totaling $44-$46MM in the August/September 2007 timeframe, and approximately $30MM today; ii) reduction in cash due to Margin Calls – there was no market for the loans in the Company's inventory - the subsequent collapse of investor interest in purchasing loans funded by ComUnity [due to market conditions, investor guideline changes, and the outstanding repurchase requests], caused margin calls [or 'curtailments'] on the short term borrowings with warehouse lenders, which had accumulated to $15MM-$18MM cash outlays by the end of August 2007; iii) ongoing operational losses caused by the slowing mortgage market, totaling $5MM in monthly losses in September alone, and $15MM year-to-date losses as of the end of September 2007; iv) the layoff of ComUnity's field mortgage sales force, cause by the above mentioned market slowdown, company operational losses, and increasing debt burden, resulting in virtually no chance for the company to survive as an independent ongoing enterprise in the medium to long term; and v) ongoing and increasing litigation expense and exposure, as a result of all of the issues surrounding the industry wide mortgage crisis and ComUnity's specific operation difficulties.

5. As part of my duties, I have undertaken to review the Company's books and records,

interview its former officers and employees and to identify the major issues facing the Company as it attempts to meet the demands of its creditors. In this regard, I have requested the Company's former chief financial officer to prepare a balance sheet setting forth the Company's assets and liabilities as of September 30, 2007 based on a present day fair market valuation in light of the current factual circumstances and comparing it to the Company prepared September 30 balance sheet based on historical costs. I have reviewed this adjusted balance sheet and based on my review of the Company's books and records concur with its contents. Attached hereto and marked as **Exhibit "A"** to this Declaration is a true and correct copy of the Adjusted September Balance Sheet. The Company is currently unable to pay its debts as they become due.

6. As part of my duties, I have reviewed the COMUNITY LENDING INC. NON-QUALIFIED DEFERRED COMPENSATION PLAN (the "Plan"), a true and correct copy of which is attached as **Exhibit "B"** to this Declaration. I am informed and believe that the Plan was originally established in the 2001/2002 timeframe and that the current iteration of the Plan is set forth in Exhibit "B". I am further informed and believe that the Plan is a non-qualified, unfunded pension plan intended to provide retirement benefits to certain highly-compensated employees selected by the Board of Directors of the Company. The Plaintiffs are all individual employees who accepted the Company's invitation to participate in the Plan.

7. I am also informed and believe that the Plan assets were governed by a so-called rabbi trust as provided for in a trust agreement in substantially the form attached hereto as **Exhibit "C"** to this Declaration. I have been unable, however, to locate an executed trust agreement. It is my understanding that all amounts under this Plan remain solely the property of the Company subject to the claims of the Company's general creditors and that no Participant or Beneficiary shall have any secured or beneficial interest in any property, rights or investments held by the Company in connection with the Plan.

8. It is my further understanding that under the terms of the Plan and the Trust, the vested account balance of a participant shall be paid from the Trust only to the extent the Company is not at the time of payment insolvent.

9. I have reviewed the Company's books and records, including the corporate minutes,

to determine the circumstances behind the Company's purported termination of the Plan and the transfer of the plan proceeds (the "Top Hat Funds") by the Plan Administrator to the Company. In this regard, it appears that in a meeting of the board of directors of the Company, ComUnity decided in August of 2007 to terminate the Plan and to distribute the funds to the employee participants. (See minutes of board meeting held on August 10, 2007, a true and correct copy of which is attached hereto as **Exhibit "D"**). ComUnity thereupon sent a written notice to the Plan Administrator, Transamerica Retirement Services, on August 29, 2007. (See attached email correspondence, dated August 29, 2007, from Janene Towner of ComUnity to Tami Skriver of Transamerica, a true and correct copy of which is attached here to as **Exhibit "E"**). The Company had several communications with the Plan Administrator regarding the logistics of terminating the Plan and of making distributions to the Employees. (See email correspondence attached hereto as **Exhibit "F"**) Satisfied that these concerns were addressed, the Company notified the Employees of the termination of the Plan in a notice dated September 4, 2007. (See attached notice dated September 4, 2007, a true and correct copy of which is attached hereto as **Exhibit "G"**). The Company instructed its employees to submit disbursement requests in a form provided by the Plan Administrator and which completed forms were received by the Company between September 7 and September 29.

10. The Company submitted the forms to the Plan Administrator which in turn cut checks payable to ComUnity Lending in the amounts attributable to each participant. To the best of my knowledge, this appears to have been standard practice. Transamerica would issue checks to ComUnity Lending which in turn would make the distributions to the employee, deducting applicable withholding taxes, among other deductions  In this case, ComUnity posted the checks to a special, sequestered account in the Company's name. Approximately $227,011, however, representing contributions from four different individuals, including one of the Plaintiffs, appears to have been posted to the Company's operating account. I have no knowledge of the criteria which former management used to pick the four checks deposited into the operating account. I am informed and believe that prior to distribution to the Employees, prior management of ComUnity considered the question as to whether the Company was insolvent and consulted with special counsel

1 regarding the propriety of distributing the funds given the specific language of the Plan precluding distributions if the Company was insolvent. Given the circumstances, and the express prohibition against paying distributions to participants when the Company was insolvent, prior management of Com Unity advised the participants that it could not make the distributions while it considered this issue.

11. I have requested the Company's former chief financial advisor to provide a reconciliation of the Top Hat Funds, showing the account status of each of the Participants, including the Plaintiffs herein. Attached hereto and marked as **Exhibit "H"** is a true and correct copy of this reconciliation. As set forth therein, the Top Hat Funds total approximately $5 million.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct and that this declaration is executed on November 28, 2007.

> /s/ *Richard G. Couch*
> Richard G. Couch