1  JOHN WALSHE MURRAY (074823)
   ROBERT A. FRANKLIN (091653)
2  DORIS A. KAELIN (162069)
   JENNY L. FOUNTAIN (226241)
3  MURRAY & MURRAY
   A Professional Corporation
4  19400 Stevens Creek Blvd., Suite 200
   Cupertino, CA 95014-2548
5  Telephone:  (650) 852-9000; (408) 907-9200
   Facsimile:  (650) 852-9244
6  Email:  jwmurray@murraylaw.com
   Email:  rfranklin@murraylaw.com
7  Email:  dkaelin@murraylaw.com
   Email:  jlfountain@murraylaw.com
8
   Attorneys for Defendant ComUnity Lending, Inc.
9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12
   MAI CHRISTINA PHAM, JOHN PHAM, MAI          )    Case No. C07-05436 JW (HRL)
13 NGUYEN, AND HUNG PERRY NGUYEN               )
                                               )
14              PLAINTIFFS                      )    Date:   December 4, 2007
                                               )    Time:   1:30 p.m.
15 VS.                                          )    Place:  United States District Court
                                               )            280 S. First Street
16 COMUNITY LENDING, INCORPORATED, A           )            San Jose, CA
   CALIFORNIA CORPORATION, ETC.                )    Judge:  Honorable James Ware
17                                             )
                DEFENDANT.                      )
18 _____)

19
20                    EXHIBIT "A" TO

21     DECLARATION OF RICHARD G. COUCH IN SUPPORT
       OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

22
23
24
25
26
27
28

ComUnity Lending, Incorporated
Assets & Liabilities
Roll forward from September 30, 2007 to 11/12/07 (revised 11/21/07)

| ASSETS | Per Books | Liquidation SAK Estimated values 11/15/2007 | Liquidation Estimated Values revised 11/21/2007 | | |
|---|---|---|---|---|---|
| Current assets: | | | | | |
| Cash | $ 1,207,478 | $ 627,000 | $ 399,152 | Approx Cash Balance as at 11/15/07 - to be reconciled | Reduced for Top Hat |
| Restricted cash - Trust | 79,344 | 79,344 | 79,344 | Unavailable Cash on Liquidation - Funds held in Trust / not CLI funds | |
| Restricted cash - Top Hat | | | 227,011 | Restricted cash related to Top Hat | |
| Restricted Cash - Sequestered For Terwin Security | | 373,000 | 373,837 | Unavailable Cash on Liquidation - Funds held on behalf of the Security | Actual number |
| Trading securities | 45,383 | | | Redeemed in October 07 | |
| Current portion of investments in loan purchases | 55,341 | | | Inventory reduction | |
| Loan origination and other receivables | 9,714,028 | 212,738 | 212,738 | See analysis below (A) | |
| Loan origination commitments | 2,358,567 | | | 12/31/06 Year end FAS133 valuation | |
| Mortgage loan inventory | 12,315,532 | 790,734 | 715,840 | As of 11/8/07 per Chito Schedule - estimated / discounted cash value | |
| Prepaid expenses | 359,965 | | | Expense to P&L | |
| Total current assets | 26,135,639 | 2,082,816 | 2,007,922 | | |
| Property and equipment, less accumulated depreciation | 1,216,255 | 150,000 | 150,000 | estimate of liquidation value | |
| | | | | | |
| Other assets: | | | | | |
| Investment in loan purchases, net of current portion | 205,882 | 411,558 | 477,500 | As of 11/8/07 per Chito Schedule - estimated / discounted cash value | |
| Real estate held for investment (REOs) | 868,662 | 3,075,140 | 1,500,000 | As of 11/8/07 per Chito Schedule - estimated / discounted cash value | CS update @ 11/21/07 |
| Investment in affiliated entities | 2,200,458 | 1,949,305 | 1,949,305 | Innergy = 0, Madrone = 1,949,305 per books, but need appraisal | |
| Investment for deferred compensation plan | 4,736,227 | 4,736,227 | 4,776,250 | Top Hat - value will be greater by approx 200K when interest is booked | updated for interest |
| Security Asset | 4,966,278 | 1,500,000 | 1,500,000 | per Chito, no cash value for two years - need to mark to mkt | |
| Deposits | 83,587 | - | | Rent Deposits will most likely not be returned | |
| Deferred Tax Asset | 238,131 | - | | 12/31/06 Auditor entry - adjusted / reviewed at end of each year. | |
| LES - eliminating entries | (5,458) | | | write off to P&L (intercompany) | |
| Total other assets | 13,293,768 | 11,672,230 | 10,203,055 | | |
| Total assets | $ 40,645,662 | $ 13,905,046 | $ 12,360,977 | | |

| LIABILITIES | | | | | |
|---|---|---|---|---|---|
| Current liabilities | | | | | |
| Warehouse lines of credit | $ 12,023,094 | $ 363,450 | $ 65,527 | As of 11/8/07 per Chito Schedule - estimated / discounted cash value | |
| Terwin Security Payable | - | $ 373,000 | $ 373,837 | Funds collected on REO sale of property now owned by the Security | |
| Employee obligations | 2,840,357 | $ 2,840,357 | $ 2,840,357 | Loans to Company for Buy Down Funds [D Fry] | |
| Accounts payable | 1,351,503 | $ 1,812,339 | $ 1,812,339 | As of 11/12/07 | |
| Accrue loan loss reserve | 310,665 | $ - | | Adjust back to P&L | |
| Accrued lease liability - defaulted obligations | - | $ 295,258 | $ 295,258 | Default Liability Calculated as of 10/30/07 - Alena Anderson | |
| Accrued liabilities | 6,247,045 | $ 8,070,800 | $ 8,070,800 | Increased by contractual obligations | |
| Total current liabilities | 22,772,663 | 13,755,204 | 13,458,118 | | |
| | | | | | |
| Deferred compensation plan payable | 4,736,227 | $ 4,736,227 | $ 5,003,261 | Liability for Top Hat - before interest of approx $200k added. | updated for interest |
| Deferred income | | | | | |
| Total liabilities | 27,508,890 | 18,491,432 | 18,461,379 | | |

| | | | |
|---|---|---|---|
| | | | Est. Value |
| Total Liabilities in Excess of Total Assets: | (4,586,385) | (6,100,402) | |
| | (a) | (c) | |

(A) Loan origination and other receivables

| | | Est. Value | |
|---|---|---|---|
| LES customer A/Rec | 269,725 | 50,000 | estimated value |
| Loan settlement rec. | 396,036 | - | Collected in October |
| Mark to market - valuation only | 67,449 | - | valuation only |
| Inventory related accounts | 6,180,473 | - | Inventory reduction |
| Deferred expense - Yield spread | 192,148 | - | Inventory reduction |
| Deferred expense - SRP & other | 5,243 | - | Inventory reduction |
| Deferred expense | 150,000 | - | Expense |
| Deferred expense | 498,521 | - | Expense |
| A/Rec GMAC | 1,597,797 | 150,000 | Estimated amount |
| A/Rec Innergy | 343,898 | - | Not sure we will collect |
| A/Rec Employees | 12,738 | 12,738 | Possible collection |
| | 9,714,028 | 212,738 | |

Additional Liabilities Not Reflected on Balance Sheet

| | | |
|---|---|---|
| Legal - litigation Contingent Exposure [Estimate] | $ 2,000,000 | |
| Repurchase requests from investors | 30,765,107 | |
| Branch Manager Profit Share [may be in Accrued Liabilities] | 907,548 | |
| Defaulted Lease Obligations [total to end of all lease contracts] | 3,940,204 | |
| Total Anticipated Liabilities Not Reflected in Sept Balance Sheet: | 37,612,859 | |
| | (b) | |

| | | | |
|---|---|---|---|
| Total Potential Exposure [assets - liabilities] | (42,199,243) | (43,713,260) | |
| | (a)-(b) | (c)-(b) | |

| Net book value - fixed assets | | Est. Value | |
|---|---|---|---|
| Furniture /fixtures | 154,489 | | |
| Computer equip & software | 891,620 | | |
| Software | 119,332 | | |
| Leasehold improv | 29,717 | | |
| Autos | 21,096 | | |
| | 1,216,255 | 100,000 | estimated value |

| Accrued liabilities (assume no change) | | Est. Value | |
|---|---|---|---|
| Accrued liabilities | 6,247,045 | | |
| Accrued compensation retail est. | 600,000 | to validate | |
| Note payable - Deutsche | 240,819 | | |
| Note payable - Impac | 59,436 | | |
| Security liability | 373,500 | | |
| Note payable - Gevity | 550,000 | to validate | |

## INVENTORY VALUATION - Estimated
## 11/21/07

| Loan origination & other receivables | | | | | | | Est. Cash value Mk to Mkt | |
|---|---|---|---|---|---|---|---|---|
| | | 09/30/07 | | 10/31/07 | | 11/21/07 | 11/21/07 | Comments: |
| Inventory - CW | $ | 6,009,869 | $ | 4,410,869 | $ | - | $ - | |
| Inventory - WAMU | $ | 360,832 | $ | 360,832 | $ | - | $ - | |
| Inventory - FC | $ | 12,300,358 | $ | 2,225,751 | $ | 1,971,000 | $ 715,840 | |
| | $ | 18,671,059 | $ | 6,997,452 | $ | 1,971,000 | $ 715,840 | See recap below |
| REO | $ | 868,662 | $ | 868,662 | $ | 3,000,000 | $ 1,500,000 | Estimate 50% of value |
| Loans held for investment | $ | 121,245 | $ | 1,513,195 | $ | 955,000 | $ 477,500 | Estimate 50% of value |
| | $ | 19,660,966 | $ | 9,379,309 | $ | 5,926,000 | $ 2,693,340 | |

**Expected cash proceeds from inventory**

| | | |
|---|---|---|
| Total inventory | $ | 1,971,000 |
| Less: 2nd mortgages to write off - wiped out | $ | (700,000) |
| Less: non-marketable 2nds and on 1st mortgages | $ | (410,000) |
| Less: expected loss on Leonard loan sale | $ | (145,160) |
| Expected cash proceeds from inventory | $ | 715,840 (a) |

**Breakdown of expected cash proceeds**

| | | | | | |
|---|---|---|---|---|---|
| Leonard loan | $ | 382,000 | 62.0% | $ | 236,840 |
| Alford loans | $ | 113,000 | 100.0% | $ | 113,000 |
| Gauvan loan | $ | 200,000 | 100.0% | $ | 200,000 |
| Huan loan | $ | 166,000 | 100.0% | $ | 166,000 |
| | | | | $ | 715,840 (a) |

| Warehouse - Liab. | | 09/30/07 | | 10/31/07 | | 11/21/07 |
|---|---|---|---|---|---|---|
| CW | $ | - | $ | - | $ | - |
| WAMU | $ | 227,324 | $ | 227,324 | $ | - |
| FC | $ | 12,023,094 | $ | 1,325,838 | $ | 65,527 |
| | $ | 12,250,418 | $ | 1,553,162 | $ | 65,527 |

| Cash invested in Loans: | | 09/30/07 | | 10/31/07 | | 11/21/07 |
|---|---|---|---|---|---|---|
| CW | $ | 6,009,869 | $ | 4,410,869 | $ | - |
| WAMU | $ | 133,508 | $ | 133,508 | $ | - |
| FC | $ | 277,264 | $ | 899,913 | $ | 1,905,473 |
| REO | $ | 868,662 | $ | 868,662 | $ | 3,000,000 |
| Loans held for investment | $ | 121,245 | $ | 1,513,195 | $ | 955,000 |
| | $ | 7,410,548 | $ | 7,826,147 | $ | 5,860,473 | S&D sale of approx $2.8m in Nov. |

## Inventory Related Assets
## Warehouse inventory, REO, Loans held for Investment
## 11/21/07

The value of inventory related assets, comprised of Warehouse InventoryLoans Held for Investmentand Real Estate Owned (REO), reduced by $13,734,966 from 9/30/07 to 11/21/07.  Correspondingly, the related warehouse liability associated with inventory was reduced by $12,184,891.

Cash invested in inventory related assets for the period ending  9/30/07 and 10/31/07 was $7,410,548 and $7,826,147, respectively.  In November there was a Scratch & Dent Sale of loan related assets in excess of $ 2 million.  Net proceeds were approximately $700k.

As of 11/21/07, the value of inventory related assets is approximately $5,926,000 with an associated warehouse liability of $65,000 and cash invested of $5,860,000.  As of 11/21/07 the estimated Mark to Market valuation (cash value) of the $5,926,000 is $2,693,000.

The $5,926,000 is comprised of Warehouse inventory ($1,971K), REO ($3,000K), and Loans held for Investment ($955K).

The breakdown of Mark to Market value is as follows: Warehouse Inventory $715,840; REO $1,500,000 (50% valuation); and Loans held for investment $477,500 (50% valuation) and Warehouse inventory ($1,971K less $700k of 2nd mortgages that will be written off because they were wiped out; less approximately $410k of 2nd mortgages plus one 1st mortgage that are not marketable (can't be sold); and less an expected loss of $145,160 on sale of marketable loans = $715,840).

ComUnity Lending Incorporated
Consolidated Statement of Operations
For the nine months ended September 30, 2007

|  | Current Month | Year-To-Date |
|---|---|---|
| Revenues: | | |
| Loan origination fees and gains (losses) | $ (2,600,953) | $ 24,064,288 |
| Interest income | 153,255 | 14,902,647 |
| Total revenues | (2,447,698) | 38,966,935 |
| | | |
| Operating expenses: | | |
| Selling, general and administrative | 1,485,959 | 39,487,811 |
| Depreciation | 39,506 | 409,905 |
| Interest expense | 317,574 | 13,681,387 |
| Total operating expenses | 1,843,039 | 53,579,103 |
| | | |
| Other expense: | | |
| (Income) loss from investments in affilitated entities | 143,891 | 364,648 |
| Total other (income) expense | 143,891 | 364,648 |
| Net income (loss) before tax | $ (4,434,629) | $ (14,976,816) |

1  JOHN WALSHE MURRAY (074823)
   ROBERT A. FRANKLIN (091653)
2  DORIS A. KAELIN (162069)
   JENNY L. FOUNTAIN (226241)
3  MURRAY & MURRAY
   A Professional Corporation
4  19400 Stevens Creek Blvd., Suite 200
   Cupertino, CA 95014-2548
5  Telephone:  (650) 852-9000; (408) 907-9200
   Facsimile:  (650) 852-9244
6  Email:  jwmurray@murraylaw.com
   Email:  rfranklin@murraylaw.com
7  Email:  dkaelin@murraylaw.com
   Email:  jlfountain@murraylaw.com
8
   Attorneys for Defendant ComUnity Lending, Inc.
9

10              UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12  MAI CHRISTINA PHAM, JOHN PHAM, MAI          )   Case No. C07-05436 JW (HRL)
13  NGUYEN, AND HUNG PERRY NGUYEN               )
                                                )
14              PLAINTIFFS                      )   Date:   December 4, 2007
                                                )   Time:   1:30 p.m.
15  VS.                                         )   Place:  United States District Court
                                                )           280 S. First Street
16  COMUNITY LENDING, INCORPORATED, A           )           San Jose, CA
    CALIFORNIA CORPORATION, ETC.                )   Judge:  Honorable James Ware
17                                              )
                DEFENDANT.                      )
18                                              )

19

20              EXHIBIT "B" TO

21   DECLARATION OF RICHARD G. COUCH IN SUPPORT
     OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

22

23

24

25

26

27

28

THIS SPECIMEN NON-QUALIFIED DEFERRED COMPENSATION PLAN DOCUMENT IS

PROVIDED BY DIVERSIFIED SOLELY FOR THE GUIDANCE OF THE EMPLOYER AND

ITS COUNSEL. DIVERSIFIED IS PROHIBITED FROM GIVING LEGAL ADVICE AND

THEREFORE CAN GIVE NO ASSURANCES THAT ANY EMPLOYER'S NON-QUALIFIED

DEFERRED COMPENSATION ARRANGEMENTS WILL MEET ALL APPLICABLE

INTERNAL REVENUE SERVICE (IRS) AND DEPARTMENT OF LABOR (DOL)

REQUIREMENTS. PARTICULAR ATTENTION SHOULD BE PAID TO THE COMPOSITION

OF THE GROUP OF EMPLOYEES ELIGIBLE TO PARTICIPATE IN THE NON-QUALIFIED

DEFERRED COMPENSATION ARRANGEMENT.

Account Number: YQ51291

GERBERM\NQPlan Com Unity Lending.doc

# TABLE OF CONTENTS

Article 1.          Introduction
Article 2.          Definitions
Article 3.          Plan Specifications
Article 4.          Distributions and Loans
Article 5.          Plan Investment
Article 6.          Beneficiary
Article 7.          Vesting and Forfeitures
Article 8.          Benefits
Article 9.          Administration
Article 10.         Miscellaneous

## ARTICLE 1. - INTRODUCTION

Whereas, the Employer wishes to establish a supplementary employee retirement plan to provide deferred compensation for a select group of management or highly compensated employees as chosen by the Employer effective October 1, 2001, and

Whereas, the Employer, who has determined pursuant to the laws of the Employer's state, may establish such a Plan;

Whereas, the Employer wishes to provide that the Plan to be established under this Agreement shall be called the Com Unity Lending Inc. Non-Qualified Deferred Compensation Plan, and

Whereas, the Employer wishes to provide under the Plan for the payment of vested accrued benefits to the Participants and their beneficiary or beneficiaries, and

Whereas, the Employer wishes to provide under the Plan that the Employer shall pay the entire cost of vested accrued benefits from its general assets and set aside contributions by the Employer to meet its obligations under the Plan, and

Whereas, the Employer intends that the assets of the Plan and Trust shall at all times be subject to the claims of the general creditors of the Employer,

Now therefore, the Employer does hereby establish the Plan as follows, and does also hereby agree that the Plan shall be structured, held and disposed of as follows:

## ARTICLE 2. - DEFINITIONS

"Age" means age at nearest birthday.

"Beneficiary" means the beneficiary or beneficiaries designated by the Participant in the Enrollment Agreement who are to receive any distributions payable upon the death of the Participant.

"Board" means the Employer's Board of Directors.

"Change of Control" means the date that any one person, or group of persons acting as a group, acquires ownership of stock of the corporation that, together with stock already held by the person or group, exceeds 50 percent of the total fair market value or total voting power of the stock of the corporation. If, however, any one person, or group of persons acting as a group, is considered to own more than 50 percent of the total fair market value or total voting power of the stock of a corporation, the acquisition of additional stock by the same person or persons is not considered to cause a change in the ownership of the corporation (or to cause a change in the effective control of the corporation).

"Compensation" means the amount payable to an Eligible Employee, for services rendered to the Employer, such as wages, salary, overtime, amounts payable pursuant to written contracts, bonuses

2

and other remuneration that is reportable to the Federal Government for the purpose of withholding Federal income taxes, or which would be reportable if it were not deferred by the Eligible Employee under this Plan.

"Computation Period" means the 12-consecutive month period beginning with the Employee's Employment Commencement Date (or, if applicable, his Re-Employment Commencement Date) and the succeeding 12-consecutive month periods beginning on the anniversaries of that commencement date.

"Deferred Compensation" means the amount of Compensation that the Participant elects to defer under the Enrollment Agreement and that the Participant and the Employer mutually agree shall be deferred in accordance with the Plan and/or the amount of any contributions made by the Employer on behalf of the Participant.

"Disability" means a Participant's total and permanent disability as a result of disease or bodily injury so as to render the Participant incapable of engaging in any substantial gainful activity by reason of any medically determinable physical or mental impairment or impairments that can be expected to result in death or that have lasted or can be expected to last for a continuous period of not less than twelve (12) months, provided that the Participant is eligible for and receives disability benefits under the Social Security Act. The Plan Administrator shall have the exclusive right of determining, with the assistance of a competent physician whether a Participant has suffered a Disability. A certificate to that effect, executed by the Plan Administrator and supported by the affidavit of an examining physician, shall be sufficient evidence of such fact and may be so accepted by the Plan Administrator without further inquiry, provided that all Participants under similar circumstances shall be treated alike.

"Effective Date" means October 1, 2001, as amended and restated September 1, 2003.

"Eligible Employee" means a member who is part of a select group of management or highly compensated individuals who performs services for the Employer as an employee and who has been chosen by the Employer each year, in his sole discretion, to be eligible to participate in the Plan.

"Employer" means Com Unity Lending, Inc. and any succeeding, controlling or continuing corporation.

"Employment or Re-employment Commencement Date" means the date on which the Eligible Employee first performs an Hour of Service for the Employer.

"Enrollment Agreement" means the agreement entered into by a Participant which specifies the amount of Deferred Compensation, the Participant's Beneficiary and the Participant' election of form of payment on Termination of Service.

"Hardship Withdrawal" A withdrawal is on account of hardship if it is due to an unforeseen emergency which creates a hardship and which occurs during employment and prior to the Participant's retirement and commencement of benefits. An unforeseen emergency is defined as (1) a severe financial hardship to the Participant, or (2) loss of the Participant's or beneficiary's property

due to casualty, or (3) other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant or beneficiary.

Payment may not be made to the extent that such hardship is or may be relieved (1) through reimbursement or compensation by insurance or otherwise, (2) by liquidation of the Participant's assets to the extent the liquidation of these assets would not itself cause severe financial hardship or (3) cessation of deferrals under the Plan.

"Participant" shall mean any Eligible Employee selected by the Employer who has elected to participate in the Plan by entering into an Enrollment Agreement.

"Participant's Account" The individual account maintained for a Participant by the insurance company under the group contract in accordance with the terms of the group contract(s) and the Plan.

"Plan" the Com Unity Lending, Inc. Non-Qualified Deferred Compensation Plan.

"Plan Year" The first Plan Year was a short Plan Year beginning on the Effective Date and ending on December 31. A Plan Year other than the first Plan Year is the 12 consecutive month period beginning on each January 1st and ending on the next following December 31st.

" Retirement " means Age 65.

"Service" means employment with the Employer including leaves of absence authorized by the Employer (such as a temporary absence authorized by the Employer because of vacation, sickness, injury, disability, layoff, or jury duty) and service in the armed forces of the United States, commencing while he is an employee, provided that he returns to the employment of the Employer as an employee at the end of such authorized absence, or within the applicable period specified in the Military Selective Service Act of 1967, and amendments thereto, after release from such service with the armed forces. Moreover, in calculating the number of a Participant's Years of Credited Service and length of participation in this Plan for all purposes hereunder, such period of absence or service with the armed forces subsequent to becoming a Participant hereunder, will be counted. However, no Contributions will be made to the Plan during such periods of absence or service with the armed forces.

"Termination of Service" shall mean severance of the Participant's services for the Employer for any reason, including retirement.

"The Top Hat Plan" is a non-qualified deferred compensation plan for a select group of management or highly compensated employees.

"Trust" shall mean the Trust Agreement between the Employer and the Trustees.

"Trustees" means the Trustees named in the Trust and their duly appointed and acting successor Trustee(s) which shall be appointed by the corporation and may consist of one or more persons.

4

## ARTICLE 3. - PLAN SPECIFICATIONS

Each Eligible Employee shall be eligible to participate in the Plan on the Effective Date. Thereafter, each Eligible Employee shall be eligible to participate in the Plan on date he is hired or promoted into a position making him an Eligible Employee. An eligible employee must also be at least age 30 and have 2 years of service with the Employer.

An Eligible Employee may enroll and become a Participant by executing an Enrollment Agreement in the calendar year preceding the calendar year in which the deferral of compensation is to commence. All Eligible Employees who are re-enrolling must do so prior to the plan anniversary date of January 1st. In the first year an employee becomes an Eligible Employee, the Eligible Employee may enroll and become a Participant within 30 days after the entry date. The entry date for newly Eligible Employees is the first day of the month following the date on which the Eligible Employee satisfies the Plan's eligibility requirements.

The Participant shall specify in his Enrollment Agreement the amount of Compensation to be deferred under the Plan. The maximum permitted to be deferred under the Plan is 100% of compensation or any other amount established by the Employer. Currently, the minimum annual contribution amount is $15,000 and the maximum annual contribution amount is $50,000. Two other plan participants are permitted to defer up to $300,000 per year.

Any salary deferrals made by an Eligible Employee under this Plan shall be held as an asset of the Employer, and the Employer intends to deposit the amounts deferred into the Trust.

The Participant may terminate his Enrollment Agreement at any time and be restored to full Compensation, prior to the calendar year in which such change is to be effective. The Participant may change his Enrollment Agreement by written notice of such change, prior to the calendar year in which such change is to be effective. An election to defer Compensation under this Plan, or to change the amount of Deferred Compensation, shall apply only to Compensation earned after such election. The Employer has the power to establish rules and from time to time to modify or change such rules governing the manner and method by which salary deferral contributions may be changed or discontinued temporarily or permanently. A Participant's Enrollment Agreement shall remain in effect unless previously modified or terminated as herein permitted until the Participant's Termination of Service.

All salary deferral contributions shall be authorized by the Participant in writing, made by payroll deduction, deducted from the Participant's compensation without reduction for any taxes or withholding (except to the extent required by law or the regulations) and paid over to the Plan and Trust by the Employer.

Contributions made to the Plan on behalf of a Participant shall include salary deferral contributions. The salary deferral contributions made under the Plan on behalf of each Participant shall be credited to the Participant's Account. The Account consists of the aggregate of all records maintained by the Employer for purposes of determining the Participant's interest in the Trust.

## ARTICLE 4. - DISTRIBUTIONS AND LOANS

4.1   All distributions to or for the benefits of a Participant shall be made in accordance with Article 8. Except for payments to a Participant described below, no part of a Participant's Account shall be distributed prior to the Participant's termination of employment with the Employer.

4.2   There are no loans available under this Plan; however, a Participant may make a Hardship Withdrawal, as defined in Article 2, from the Plan. Any Eligible Employee who is a Participant in both this Plan and the 401(k) Plan must draw down all funds available to him under this Plan before he can request a hardship withdrawal from the participant's 401(k) Plan, if any.

## ARTICLE 5. - PLAN INVESTMENT

5.1   All contributions will be invested under the Diversified Investors Securities Corporation Mutual Funds, which will include Transamerica and Non-Transamerica Selected Funds under which Participant Accounts will be established for each Participant. The Employer invests plan assets in its discretion, taking into account (to the extent it deemed advisable) instructions received from Participants. A Participant's investment choices are limited to the types of investments as so elected by the Employer.

Unless otherwise so elected, the Employer hereby designates that plan participants may direct the investment of the deferred amounts, but only from a menu of investment alternatives made available by the Employer under the Plan and under a policy established by the Employer.

5.2   All amounts under this Plan, including all investments purchased with such amounts and all income attributable thereto, shall remain (until made available to the Participant or Beneficiary) solely the property of the Employer (without being restricted to the provision of benefits under the Plan) subject to the claims of the Employer's general creditors. No Participant or Beneficiary shall have any secured or beneficial interest in any property, rights or investments held by the Employer in connection with the Plan.

## ARTICLE 6. - BENEFICIARY

6.1   The Participant shall designate the Beneficiary or Beneficiaries who are to receive distributions in the event of the Participant's death. If the Participant has not properly designated a Beneficiary, or if for any reason such designation shall not be legally effective, or if said designated Beneficiary or Beneficiaries shall predecease the Participant, then the Participant's order of Beneficiary is the Participant's spouse, the Participant's per stirpes, the

Participant's parents, the Participant's brothers and sisters (including step brothers and sisters) and then the Participant's estate. A Participant may change his Beneficiary designation at any time prior to the payment status.

## ARTICLE 7. - VESTING AND FORFEITURES

7.1    <u>Vesting</u>. The value of a Participant's Account shall be fully vested at all times subject, however, to the reach of the Employer's creditors in the event of insolvency.

7.2    When employment is terminating and payment is not deferred, the amount of the payment shall be based on the value of the Participant's Account plus any contributions subsequently credited to such Account and less any distributions subsequently made from the Account.

## ARTICLE 8. - BENEFITS

8.1    <u>Termination and Retirement Distributions.</u> All Participants shall elect the payment option described below under which a distribution will be made following Termination of Service or at Retirement, if so elected. Payment of benefits will begin as soon as administratively feasible provided that in no case will payment of benefits begin later than 60 days after the close of the Plan Year in which the Participant terminates service or retires.

8.2    <u>Change of Distribution Date for Termination and Retirement Distribution</u>. A least 12 months in advance of the distribution date, a Participant may change the date when Termination and Retirement distribution payments are to commence. Specifically, if a participant previously elected that payments will be made following Retirement, but instead wants payments to be made at Termination, he can change his election provided that such election is made at least 12 months prior to the actual Termination date, and he is not within 12 months of Retirement. A Participant can also switch from a Termination to Retirement Distribution provided that such election is made at least 12 months prior to Retirement, and he is not within 12 months of actual Termination.

8.3    <u>Method of Payment for Termination and Retirement Distributions.</u> A Participant may elect a method of payment from his or her entire account to be paid as follows:

- Lump sum, or
- Equal annual installments up to a period not to exceed 10 years.

The Participant's account balance must be at least $5,000 in order for the payout to be anything other than a lump sum. Such election shall be designated by the Participant in the enrollment and distribution agreements.

8.4     <u>Change of Method of Payment for Termination and Retirement Distributions.</u> A Participant may change the Method of Payment at least 12 months prior to a Termination and Retirement Distribution. The Company may at any time pay the Participant's remaining balance in a lump sum or accelerate the payments.

8.5     <u>Scheduled In-Service Distribution.</u> A Participant with at least 5 years of plan participation, may at least 2 calendar years in advance of a payout date, request a Scheduled In-Service Distribution that will commence on a date prior to Termination and Retirement Distributions.

8.6     <u>Change Scheduled In-Service Distribution.</u> A Participant may change the date of the Scheduled In-Service Distribution by making a new Scheduled In-Service Distribution Election. The new election must be made at least 2 calendar years prior to the new Scheduled In-Service Distribution. Such elections shall be designated by the Participant in the distribution form. A Participant can elect more then one Scheduled In-Service Distribution but only one payment is permitted in any one calendar year.

8.7     <u>Method of Payment for Scheduled In-Service Distribution.</u> A Participant may elect a single sum to be paid as follows:

- A percentage of the total account balance, or
- A Dollar Amount.

The minimum payout amount must be at least $5,000.

8.8     <u>Overlap of Scheduled In-Service Distribution and for Termination and Retirement Distribution.</u> If a Participant requested a Scheduled In-Service Distribution but the Participant will receive the Termination and Retirement Distribution in the same year, the In-Service Distribution election is null and void. The payments will be made based on Method of Payment for Termination and Retirement Distribution.

8.9     <u>Default Method of Payment.</u> If a Participant does not elect a Method of Payment for the Termination and Retirement Distribution, the default payout is lump sum.

8.10    <u>Default Distribution Date.</u> If a Participant does not elect a Termination and Retirement Distribution, the Default Distribution Date is at Termination of Service.

8.11    <u>Death Benefit.</u> Benefits under this Plan are immediately payable in a lump sum upon death. If Participant is already in pay status, balance of the account is paid out in a lump sum.

8.12    <u>Change of Control.</u> Benefits under this Plan are immediately payable in a lump sum upon a Change of Control described in Article 2.

8.13   <u>Plan Termination</u>.  Benefits under this Plan are immediately payable in a lump sum upon a Plan Termination.

8.14   <u>Committee Discretion</u>.  Notwithstanding the foregoing, the Committee may, in its sole and exclusive discretion, modify payments made pursuant to Article 8.

## ARTICLE 9. - ADMINISTRATION

9.1   <u>Plan Administrator</u>.  The Administrator of the Plan shall be the Employer or, if applicable, the person(s) or entity appointed by the Employer to administer the Plan.  The Plan Administrator shall serve at the pleasure of the Employer and the Employer shall have the right to appoint, in its sole and absolute discretion, any successor Plan Administrator.

9.2   <u>Power and Authority</u>.  The Plan Administrator shall have full power and authority to adopt rules and regulations (including without limitation a reasonable claims procedure) for the administration of the Plan, and to interpret, alter, amend, or revoke any rules and regulations so adopted.  The Plan Administrator shall have full power and authority to interpret the terms and provisions of this Plan and any instrument filed hereunder.

9.3   <u>Presumption of Fairness</u>.  Every action taken by the Plan Administrator shall be presumed to be a fair and reasonable exercise of the authority vested in, or the duties imposed upon, the Plan Administrator.  The Plan Administrator shall be deemed to have acted impartially as to all persons interested, unless the contrary be proven by affirmative evidence.  The Plan Administrator shall not be liable for amounts of Deferred Compensation by a Participant or for other amounts payable under the Plan.

9.4   <u>Other Parties</u>.  Any person or entity which issues policies, contracts, or investment media to the Employer or in respect of a Participant is not a party to this Plan and such person or entity shall have no responsibility, accountability or liability to the Employer, the Plan Administrator, any Participant, or any Beneficiary with regard to the operation or adequacy of this Plan, including any future amendments made thereto.

9.5   <u>Information Requests</u>.  Any party entitled to payment under this Plan shall comply with all written requests of the Plan Administrator or its designee to furnish the Employer with any information known or available to such party and necessary to the administration of the Plan.

9.6   <u>Expenses.</u>  If not paid by the Employer, all reasonable expenses incurred in the administration of the Plan, including without limitation those of any trustee and the Plan Administrator, shall be paid from Participants' Accounts to which such expenses are allocable.

9.7   <u>No Fiduciary Relationship</u>.  Neither the Plan, nor any action taken by the Plan Administrator or the Employer, shall create or be deemed to create a trust or fiduciary relationship of any kind between the Employer and the Participant, his or her Beneficiary, or any other person.

9

9.8  Employment.  Participation in this Plan shall not be deemed to be a contract of employment between the Employer and any Employee.  Nor shall anything contained herein be deemed to give any Employee the right to be retained in the employ of the Employer or to interfere with the right of the Employer to discharge any Employee at any time, nor shall it be deemed to give the Employer the right to require any Employee to remain in its employ, nor shall it interfere with such Employee's right to terminate his employment at any time (as may be provided in any contract or agreement affecting such employment).

## ARTICLE 10. - MISCELLANEOUS

10.1  Amendment of Plan.  The Employer reserves the right to amend any provisions of the Plan at any time to the extent that it may deem advisable without the consent of the Participant or any Beneficiary provided that no such amendment shall impair the rights of Participants or Beneficiaries with respect to Compensation deferred before such amendment.

10.2  Termination of Plan.  The Employer reserves the right to terminate the Plan at any time. Upon termination of the Plan, the Participant's full Compensation on a non-deferred basis will be thereupon restored.  Upon the termination of the Plan, all participants will be 100% vested. In the year of plan termination, benefits are immediately payable in a lump sum cash payment to participants.  Any participant who is already in pay status and has been receiving payments in a method other than a lump sum shall receive the balance of their account in a lump sum cash payment. If the Plan, which was designed and intended to be a Top-Hat Plan is deemed not to be a Top-Hat Plan, it will be terminated and contributions will be distributed to Participants in the Plan.

10.3  Finality of Decisions.  The Plan Administrator's benefit determinations or other decisions or interpretations made under the Plan shall be binding and final on all interested parties.

10.4  The Employer may, from time to time, hire outside consultants, accountants, actuaries, legal counsel, or recordkeepers to perform such tasks as the Employer may from time to time determine.

10.5  In the event that any Participants are found to be ineligible, that is, not members of a select group of highly compensated employees, according to a determination made by the Department of Labor, the Employer will take whatever steps it deems necessary, in its sole discretion, to equitably protect the interests of the affected Participants.

10.6  No benefits under the Plan shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge or encumbrance.  The provisions of this Plan shall be binding upon and inure to the benefit of the Employer and Participants and their respective successors, heirs, personal representatives, executors, administrators, and legatees.

The vested Account balance of a Participant shall be paid from the Trust only to the extent the Employer is not at the time of payment insolvent. Any vested accrued benefits under the Plan represent an unfunded, unsecured promise by the Employer to pay these benefits to the Participants when due. A Participant has no greater right to Trust assets than the general creditors of the Employer in the event that the Employer shall become insolvent. Trust assets can be used to pay only vested accrued benefits under the Plan or the claims of the Employer's general creditors.

10.7   This Plan and the Enrollment Agreement, and any subsequently adopted amendment thereof, shall constitute the total agreement or contract between the Employer and the Participant regarding the Plan. No oral statement regarding the Plan may be relied upon by the Participant.

10.8   Change of Law. If, because of a change in law, the Trust should be determined to no longer be considered a "rabbi trust" as currently permitted by IRS Private Letter Ruling 8113107, then the Plan and Trust shall be deemed to have terminated as of the effective date of the change in law which nullified its status as a "rabbi trust".

10.9   This Plan shall be construed under the laws of California.

IN WITNESS WHEREOF, Com Unity Lending Inc. has caused this Plan to be executed by its duly authorized officers this 4th.
day of Sept. , 2003  .

IN PRESENCE OF:

_____                     By: _____

_____                          Janene Towner
                                               TITLE: Sr. Vice-President/COO

_____

11

1 JOHN WALSHE MURRAY (074823)
  ROBERT A. FRANKLIN (091653)
2 DORIS A. KAELIN (162069)
  JENNY L. FOUNTAIN (226241)
3 MURRAY & MURRAY
  A Professional Corporation
4 19400 Stevens Creek Blvd., Suite 200
  Cupertino, CA 95014-2548
5 Telephone:  (650) 852-9000; (408) 907-9200
  Facsimile:  (650) 852-9244
6 Email:  jwmurray@murraylaw.com
  Email:  rfranklin@murraylaw.com
7 Email:  dkaelin@murraylaw.com
  Email:  jlfountain@murraylaw.com
8
  Attorneys for Defendant ComUnity Lending, Inc.
9

10       UNITED STATES DISTRICT COURT

11       NORTHERN DISTRICT OF CALIFORNIA

12
  MAI CHRISTINA PHAM, JOHN PHAM, MAI  )  Case No. C07-05436 JW (HRL)
13 NGUYEN, AND HUNG PERRY NGUYEN   )
              )
14      PLAINTIFFS    )  Date: December 4, 2007
              )  Time: 1:30 p.m.
15 VS.          )  Place: United States District Court
              )     280 S. First Street
16 COMUNITY LENDING, INCORPORATED, A )     San Jose, CA
  CALIFORNIA CORPORATION, ETC.   )  Judge: Honorable James Ware
17              )
      DEFENDANT.   )
18              )

19

20         EXHIBIT "C" TO

21    DECLARATION OF RICHARD G. COUCH IN SUPPORT
    OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

22

23

24

25

26

27

28

# Trust Agreement

Please note that this Trust Agreement is a proprietary document of Investors Bank & Trust Company (IBT), which is offered for use solely by clients of Diversified Investment Advisors, Inc. and its affiliated companies (Diversified). Trustee services are provided by IBT as a directed trustee under this document to clients of Diversified free of charge due to Diversified's unique business relationship with IBT.

Please note that this Trust Agreement may not be modified or altered in any way. Also note there is no obligation to appoint IBT as plan trustee, a different trustee may be appointed at your discretion.

We would be glad to answer any questions you or your legal counsel may have regarding the Trust Agreement's provisions.

*457(f)/457(b) Deferred Compensation Plans*
*(Tax-Exempt Organization- Not-for-Profit Region)*
*Non Qualified Deferred Compensation Plans*
*(Corporate Plans Region)*

# TRUST AGREEMENT

(a)    This Agreement between ComUnity Lending Inc. ("Employer") and Investors Bank & Trust Company ("Trustee") is effective September 1, 2003;

(b)    **WHEREAS**, the Employer has adopted the ComUnity Lending, Inc. Non-Qualified Deferred Compensation Plan ("Plan");

(c)    **WHEREAS**, the Employer has incurred or expects to incur liability under the terms of such Plan with respect to the individuals participating in such Plan;

(d)    **WHEREAS**, the Employer wishes to establish a trust (hereinafter called "Trust") and to contribute to the Trust assets that shall be held therein, subject to the claims of the Employer's creditors in the event of the Employer's Insolvency, as herein defined, until paid to Plan participants and their beneficiaries in such manner and at such times as specified in the Plan;

(e)    **WHEREAS**, it is the intention of the parties that this Trust shall constitute an unfunded arrangement and shall not affect the status of the Plan as an unfunded plan maintained for the purpose of providing deferred compensation for a select group of management or highly compensated employees for purposes of Title I of the Employee Retirement Income Security Act of 1974;

(f)    **WHEREAS**, it is the intention of the Employer to make contributions to the Trust to provide itself with a source of funds to assist it in the meeting of its liabilities under the Plan;

**NOW, THEREFORE**, the parties do hereby establish the Trust and agree that the Trust shall be comprised, held and disposed of as follows:

## Section 1.    Establishment Of Trust

(a)    The Employer hereby deposits contributions with the Trustee in Trust, which shall become the principal of the Trust to be held, administered and disposed of by Trustee as provided in this Trust Agreement.

(b)    The Trust hereby established shall be irrevocable.

(c)    The Trust is intended to be a grantor trust, of which the Employer is the grantor, within the meaning of subpart E, part I, subchapter J, chapter 1, subtitle A of the Internal Revenue Code of 1986, as amended, and shall be construed accordingly.

Rev. 1/03

(d)  The principal of the Trust and any earnings shall be held separate and apart from other funds of the Employer and shall be used exclusively for the uses and purposes of Plan participants and general creditors as herein set forth.  Plan participants and their beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust.  Any rights created under the Plan and this Trust Agreement shall be mere unsecured contractual rights of Plan participants and their beneficiaries against Employer.  Any assets held by the Trust will be subject to the claims of the Employer's general creditors under federal and state law in the event of Insolvency, as defined in Section 3(a).

(e)  The Employer, in its sole discretion, may at any time, or from time to time, make additional deposits of cash in trust with the Trustee to augment the principal to be held, administered and disposed of by Trustee as provided in this Trust Agreement.  Neither the Trustee nor any Plan participant or beneficiary shall have any right or duty to compel such additional deposits.

**Section 2.**        **Payments to Plan Participants and Their Beneficiaries**

(a)  The Employer shall provide to the Trustee all information necessary regarding the benefit payable in respect of each Plan participant (and his or her  beneficiaries), and other instructions required by the Trustee such as the form in which such amount is to be paid, (as provided for or available under the Plan), the time of commencement for payment of such amounts and tax withholding instructions.  Except as otherwise provided herein, the Trustee shall make payments to or for the benefit of, the Plan participants and their beneficiaries in accordance with such information.  The Trustee shall make provision for the reporting and withholding of any federal, state or local taxes that may be required to be withheld with respect to the payment of benefits pursuant to the terms of the Plan.

(b)  The entitlement of a Plan participant or his or her beneficiaries to benefits under the Plan shall be determined by the Employer or such party as it shall designate under the Plan, and any claim for such benefits shall be considered and reviewed under the procedures set out in the Plan.

(c)  The Employer may make payment of benefits directly to the Plan participants or their beneficiaries as they become due under the terms of the Plan.  The Employer shall notify the Trustee of its decision to make payment of benefits directly prior to the time amounts are payable to participants or their beneficiaries.  In addition, if the principal of the Trust and any earnings are not sufficient to make payments of benefits in accordance with the terms of the Plan, the Employer shall make the balance of each such payment as it falls due.  The Trustee shall notify the Employer where principal and earnings are not sufficient.

**Section 3.**        **Trustee Responsibility Regarding Payments to**
                      **Trust Beneficiary When Employer is Insolvent**

(a)  The Trustee shall cease payment of benefits to or for the benefit of Plan participants and their beneficiaries if the Employer is Insolvent.  The Employer shall be considered "Insolvent" for purposes of this Trust Agreement if (i) the Employer is unable to pay its debts as they become due, or (ii) the Employer is subject to a pending proceeding as a debtor under the United States Bankruptcy Code.

(b)  At all times during the continuance of this Trust, as provided in Section 1(d) hereof, the principal and income of the Trust shall be subject to claims of general creditors of the Employer under federal and state law as set forth below.

(1) The Board of Directors/Trustees and Chief Executive Officer on behalf of the Employer shall have the duty to inform the Trustee in writing of the Employer's Insolvency. If a person claiming to be a creditor of the Employer alleges in writing to the Trustee that the Employer has become Insolvent, the Trustee shall determine whether the Employer is Insolvent and, pending such determination, Trustee shall discontinue payment of benefits to Plan participants or their beneficiaries.

(2) Unless the Trustee has actual knowledge of the Employer's Insolvency, or has received notice from the Employer or a person claiming to be a creditor alleging that the Employer is Insolvent, the Trustee shall have no duty to inquire whether the Employer is Insolvent. The Trustee may in all events rely on such evidence concerning the Employer's solvency as may be furnished to the Trustee and that provides the Trustee with a reasonable basis for making a determination concerning the Employer's solvency.

(3) If at any time the Trustee has determined that the Employer is Insolvent, the Trustee shall discontinue payments to Plan participants or their beneficiaries and shall hold the assets of the Trust for the benefit of the Employer's general creditors. Nothing in this Trust Agreement shall in any way diminish any rights of Plan participants or their beneficiaries to pursue their rights as general creditors of the Employer with respect to benefits due under the Plan or otherwise.

(4) The Trustee shall resume the payment of benefits to Plan participants or their beneficiaries in accordance with Section 2 of this Trust Agreement only after the Trustee has determined that the Employer is not Insolvent (or is no longer Insolvent).

(c) Provided that there are sufficient assets, if the Trustee discontinues the payment of benefits from the Trust pursuant to Section 3(b) and subsequently resumes such payments, the first payment following such discontinuance shall include the aggregate amount of all payments due to the Plan participants or their beneficiaries under the terms of the Plan for the period of such discontinuance, less the aggregate amount of any payments made to the Plan participants or their beneficiaries by the Employer in lieu of the payments provided for hereunder during any such period of discontinuance.

**Section 4.**        **Payments to Employer**

Except as provided in Section 3, after the Trust has become irrevocable, the Employer shall have no right or power to direct the Trustee to return to the Employer or to divert to others any of the Trust assets before all payment of benefits have been made to the Plan participants and their beneficiaries pursuant to the terms of the Plan.

**Section 5.**        **Investment Authority**

(a) In no event may the Trustee invest in securities (including stock or rights to acquire stock) or obligations issued by the Employer, other than a de minimis amount held in common investment vehicles in which the Trustee invests. Except as provided below, all rights associated with assets of the Trust shall be exercised by the Trustee or the person designated by the Trustee, and shall in no event be exercisable by or rest with Plan participants, except that voting rights with respect to Trust assets will be exercised by the Employer, and except that dividend rights with respect to Trust assets will rest with the Employer.

(b)    The Trustee shall have the power:

    (i)    to invest the Trust as directed by the Employer, and

    (ii)    to collect and receive any and all money and other property due to the Trust and to give full discharge therefor.

(c)    The Trustee shall follow the directions of the Employer with respect to investing and reinvesting the Trust. The Employer shall be responsible to ensure that its directions are in accordance with the Plan and are not contrary to law. The Trustee shall have no responsibility to monitor investments of the Trust, and shall not be liable for any investment losses or consequences resulting from any action or inaction of the Employer with respect to the investments of the Trust. Subject to said directions, the Trustee will invest Trust assets only by utilizing investments or investment vehicles or options made available through or permitted by Diversified Investment Advisors, Inc. ("Diversified") or one of its affiliates; including fixed and variable group annuity contracts, investment companies registered under the Investment Company Act of 1940 and Schwab's Personal Choice Retirement Account™.

(d)    Employer To Establish Rules:    The Employer may at any time make such uniform and nondiscriminatory rules as it determines necessary or appropriate regarding the administration and investment of the Trust assets.

## Section 6.    Disposition of Income

(a)    During the term of this Trust, all income received by the Trust, net of expenses and taxes, shall be accumulated and reinvested.

## Section 7.    Accounting by Trustee

The Trust shall be valued daily. The Trustee shall keep accurate and detailed records of all investments, receipts, disbursements, and all other transactions required to be made, including such specific records as shall be agreed upon in writing between the Employer and Trustee. Within 90 days following the close of each calendar year and within 90 days after the removal or resignation of the Trustee, Trustee shall deliver to the Employer a written account of its administration of the Trust during such year or during the period from the close of the last preceding year to the date of such removal or resignation, setting forth all investments, receipts, disbursements and other transactions effected by it, including a description of all securities and investments purchased and sold with the cost or net proceeds of such purchases or sales (accrued interest paid or receivable being shown separately), and showing all cash, securities and other property held in the Trust at the end of such year or as of the date of such removal or resignation, as the case may be. The written approval of any accounting by the Employer shall be final as to all matters and transactions stated or shown therein and binding upon the Employer and all persons who then shall be or thereafter shall become interested in this Trust. Failure of the Employer to notify the Trustee within 180 days after receipt of any accounting of its disapproval of such accounting shall be the equivalent of written approval.

## Section 8.    Responsibility of Trustee

(a)    The Trustee shall act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in like capacity and familiar with such matters would use in

the conduct of an enterprise of a like character and with like aims, provided, however, that Trustee shall incur no liability to any person for any action taken pursuant to a direction, request or approval given by Employer which is contemplated by, and in conformity with, the terms of the Plan or this Trust and is given in writing by Employer. In the event of a dispute between the Employer and another party, the Trustee may apply to a court of competent jurisdiction to resolve the dispute.

(b)    If the Trustee undertakes or defends any litigation arising in connection with this Trust, the Employer agrees to indemnify the Trustee against Trustee's costs, expenses and liabilities (including without limitation, attorney's fees and expenses) relating thereto and to be primarily liable for such payments. If the Employer does not pay such costs, expenses and liabilities in a reasonably timely manner, the Trustee may obtain payment from the Trust.

(c)    The Trustee may consult with legal counsel (who may also be counsel for the Employer generally) with respect to any of its duties or obligations under the Trust.

(d)    The Trustee may hire agents, accountants, actuaries, investment advisors, financial consultants or other professionals to assist it in performing any of its duties or obligations under the Trust. As of the effective date of the Trust Agreement, the Trustee has appointed Diversified as the agent to which it has delegated certain duties. Also, as of the effective date of the Trust Agreement, the Trustee appoints the Employer as its authorized representative to which it has delegated the authority to sign on the Trustee's behalf all documents relating to the investment of Plan assets in any vehicle sponsored by or made available through Diversified and its affiliates.

(e)    The Trustee shall have, without exclusion, all powers conferred on Trustees by applicable law, unless expressly provided otherwise herein.

(f)    Notwithstanding any powers granted to the Trustee pursuant to this Trust Agreement or to applicable law, Trustee shall not have any power that could give this Trust the objective of carrying on a business and dividing the gains therefrom, within the meaning of section 301.7701-2 of the Procedure and Administrative Regulations promulgated pursuant to the Internal Revenue Code.

(g)    The Trustee shall be accountable only for funds actually received by it hereunder and shall have no duty or liability to determine that the amount of the funds received by it comply with provision of the Plan.

## Section 9.        Compensation and Expenses of Trustee

(a)    There are currently no fees due the Trustee from the Plan. However, the Trustee reserves the right to impose and/or amend fees upon the giving of 90 days' advance written notice to the Employer. If the Trustee resigns or is removed during the 90 day notice period, such new or amended fees will not be in effect.

(b)    Any fees imposed pursuant to (a) which are incurred in the administration of the Trust may be paid directly to the Trustee by the Employer. All fees not so directly paid by the Employer shall be paid from the assets of the Trust.

(c)    In order to provide for payment of any fees not paid directly by the Employer as provided in (b), the Trustee in its discretion may partially or fully liquidate any asset in the Trust and shall not be liable for any loss resulting from such liquidation. Any fees of the Trustee which are not paid from the Trust for whatever reason will be the responsibility of the Employer. Any payment out of the Trust

of any of the fees authorized in this Section shall be deemed to be for the exclusive benefit of the Participants and their successors in interest.

### Section 10.        Resignation and Removal of Trustee

(a)     Trustee may resign at any time by written notice to Employer, which resignation shall be effective 90 days after the Employer's receipt of such notice unless the Employer and Trustee agree otherwise.

(b)     The Trustee may be removed by the Employer on 90 days advance written notice or upon shorter notice accepted by Trustee.

(c)     Upon a Change of Control, as defined herein, the Trustee may not be removed by Employer for one year.

(d)     Upon resignation or removal of the Trustee and appointment of a successor Trustee, all assets shall subsequently be transferred to the successor Trustee. The transfer shall be effective no less than 90 days after receipt of notice of resignation, removal or transfer unless the Employer shortens the time limit.

(e)     If Trustee resigns or is removed, a successor shall be appointed, in accordance with Section 11. hereof, by the effective date of resignation or removal under paragraph(s) (a) or (b) of this section. If no such appointment has been made, Trustee may apply to a court of competent jurisdiction for appointment of a successor or for instructions. All expenses of Trustee in connection with the proceeding shall be allowed as administrative expenses of the Trust.

### Section 11.        Appointment of Successor

(a)     If the Trustee resigns or is removed in accordance with Section 10(a) or (b) the Employer may appoint any third party, such as a bank trust department or other party that may be granted corporate trustee powers under state law, as a successor to replace Trustee upon resignation or removal. The appointment shall be effective when accepted in writing by the new Trustee, who shall have all of the rights and powers of the former Trustee, including ownership rights in the Trust assets. The former Trustee shall execute any instrument necessary or reasonably requested by the Employer or the successor Trustee to evidence the transfer.

(b)     The successor Trustee need not examine the records and acts of any prior Trustee and may retain or dispose of existing Trust assets, subject to Sections 7 and 8. The successor Trustee shall not be responsible for and the Employer shall indemnify and defend the successor Trustee from any claim or liability resulting from any action or inaction of any prior Trustee or from any other past event, or any condition existing at the time it becomes successor Trustee.

**Section 12.**        **Amendment or Termination**

(a)    This Trust Agreement may be amended by a written instrument executed by both the Trustee and Employer. Notwithstanding the foregoing, no such amendment shall conflict with the terms of the Plan or shall make the Trust revocable after it has become irrevocable in accordance with Section 1(b).

(b)    The Trust shall not terminate until the date on which Plan participants and their beneficiaries are no longer entitled to benefits pursuant to the terms of the Plan(s). Upon termination of the Trust any assets remaining in the Trust shall be returned to the Employer.

**Section 13.**        **Miscellaneous**

(a)    Any provision of this Trust Agreement prohibited by law shall be ineffective to the extent of any such prohibition, without invalidating the remaining provisions hereof.

(b)    Benefits payable to Plan participants and their beneficiaries under this Trust Agreement may not be anticipated, assigned (either at law or in equity), alienated, pledged, encumbered or subjected to attachment, garnishment, levy, execution or other legal or equitable process.

(c)    This Trust Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

(d)    Depending on the type of plan being covered under this Trust, either 1) or 2) below is applicable.

        1)    For purposes of this Trust and if the Employer is a stock corporation, Change of Control shall mean: "the purchase or other acquisition by any person, entity or group of persons, within the meaning of Section 13(d) or 14(d) of the Securities Exchange Act of 1934 ("Act"), or any comparable successor provisions, of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Act) of 30 percent or more of either the outstanding shares of common stock or the combined voting power of the Employer's then outstanding voting securities entitled to vote generally, or the approval by the stockholders of the Employer of a reorganization, merger, or consolidation, in each case, with respect to which persons who were stockholders of the Employer immediately prior to such reorganization, merger or consolidation do not, immediately thereafter, own more than 50 percent of the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated Employer's then outstanding securities, or a liquidation or dissolution of the Employer or of the sale of all or substantially all of the Employer's assets".

        2)    For purposes of this Trust and if the Employer is not a stock corporation, Change of Control shall mean: "the acquisition by any person or entity (or group of related persons or entities acting in concert), unrelated to the Employer, of control of the Employer, or a liquidation or dissolution of Employer, or sale of all or substantially all of Employer's assets. For purposes of this Section 13(d), the term "control" means that more than 50 percent of the members, directors or trustees of the Employer are either representatives of or directly or indirectly controlled by a person or entity (or group of related persons or entities acting in concert) unrelated to the Employer. A member, director or trustee is a representative of a person or entity (or group of related persons or entities acting in concert) unrelated to the Employer if he is a member, director, trustee, agent or employee of any such persons or entities, or

elected or appointed by any such persons or entities. A member, director or trustee is controlled by a person or entity (or group of related persons or entities acting in concert) unrelated to the Employer if any such person or entity has the power to elect or appoint or remove such member, director or trustee and designate a new member, director or trustee."

(e)    The Employer shall provide written notice to the Trustee of any Change of Control no later than 30 days after such Change of Control takes place.

## Section 14.    Written Notice

Written Notice. Any written notice, demand, direction, or instruction given to the parties to this Agreement shall be duly given if mailed or delivered:

(a) to the Trustee, at Investors Bank & Trust Company, 200 Clarendon Street, Boston, MA  02116, Attention: Director, Trust and Custody Services, or any other address as shall be specified by the Trustee in writing; and

(b) to the Employer, at the address indicated on the signature page.

A copy of any written notice, demand, direction, or instruction between the parties to the Agreement shall be sent to Diversified Investment Advisors, Inc., 4 Manhattanville Road, Purchase, NY 10577, Attention: Mr. Peter G. Kunkel.

Employer

By: _____
(Authorized Representative)

Address for receipt of notices

610 Jarvis Dr., Suite 200

Morgan Hill, CA  95037

_____

_____

Trustee

By: _____

dcgtech/template/nqtribt

1   JOHN WALSHE MURRAY (074823)
    ROBERT A. FRANKLIN (091653)
2   DORIS A. KAELIN (162069)
    JENNY L. FOUNTAIN (226241)
3   MURRAY & MURRAY
    A Professional Corporation
4   19400 Stevens Creek Blvd., Suite 200
    Cupertino, CA 95014-2548
5   Telephone: (650) 852-9000; (408) 907-9200
    Facsimile: (650) 852-9244
6   Email: jwmurray@murraylaw.com
    Email: rfranklin@murraylaw.com
7   Email: dkaelin@murraylaw.com
    Email: jlfountain@murraylaw.com
8
    Attorneys for Defendant ComUnity Lending, Inc.
9

10                  UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12
    MAI CHRISTINA PHAM, JOHN PHAM, MAI        )   Case No. C07-05436 JW (HRL)
13  NGUYEN, AND HUNG PERRY NGUYEN             )
                                              )
14              PLAINTIFFS                     )   Date:  December 4, 2007
                                              )   Time:  1:30 p.m.
15  VS.                                       )   Place: United States District Court
                                              )          280 S. First Street
16  COMUNITY LENDING, INCORPORATED, A         )          San Jose, CA
    CALIFORNIA CORPORATION, ETC.              )   Judge: Honorable James Ware
17                                            )
                DEFENDANT.                     )
18                                            )

19

20                      EXHIBIT "D" TO

21        DECLARATION OF RICHARD G. COUCH IN SUPPORT
        OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

22

23

24

25

26

27

28

**ComUnity Lending, Incorporated**
**Board of Directors Meeting**
**August 10, 2007**

Called to Order By Darryl Fry
Attendees:  Janene Towner, Darryl, Fry, Jayson Stebbins
Location: 610 Jarvis Dr., Morgan Hill, CA 95037, California Conference Room
Decision/Minutes recorded by Darryl Fry

Meeting called to order at 9:30 AM by Darryl Fry

The Board has been assembled to discuss various issues.

1. Subject:  Lender E-Source and Optimal Blue form a joint venture wherein they share technology and share earnings. Possible sale of Lender E-Source to Beanstalk.

   a. Motion: Janene Towner moves that the Board authorize Derek Long, President of Lender E-Source, to enter into negotiation with both Optimal Blue and Beanstalk for a possible joint venture and/or sale.

   b. Discussion:

      i. Jayson Stebbins:  Question:  They are separate operations?

      ii. Darryl Fry:  Yes, they are but we can group them, because they are tied together.  Beanstalk has expressed interest in Lender E-Source on a purchase basis.  Negotiations with Optimal Blue may effect Beanstalk negotiations either negatively or positively.

   c. Seconded by Jayson Stebbins

   d. Passed by unanimous vote

2. Subject:  Proposal to withdraw from the affiliate broker program and so inform our joint venture partner with Innergy Lending, WFG.  There have been previous discussions and a proposed letter has been drawn up.  Darryl has input on letter.

   a. Motion:  Jayson Stebbins moves to authorize the issuance of the letter dated August 10, 2007 to WFG, subject to the input from the Leadership Team.

   b. Seconded by Janene Towner

   c. Passed by unanimous vote

3. Subject:  City First Funding partnership. The partnership is a modified correspondent relationship with ComUnity Lending, because it is unique in many respects, i.e. ComUnity Lending has some of City First Funding staff on its payroll. The partnership needs to be turned into a traditional correspondent relationship by requiring City First Funding staff be moved off the ComUnity Lending payroll.  The partnership would still have some modification because City First Funding still outsource to ComUnity Lending for some things, including the use of our Seamless system and our Capital Markets group.

**ComUnity Lending, Incorporated**
**Board of Directors Meeting**
**August 10, 2007**

a. Darryl Fry moves to confirm the decision to engage in a modified correspondent relationship with City First Funding and also to set a target date for City First Funding's personnel to be moved off of ComUnity Lending's payroll and employment by August 24, 2007.

b. Seconded by Janene Towner

c. Passed by unanimous vote

4. Subject: ComUnity Lending has been approached by ABC (America's Brokers Conduit), a wholesale portion of American Home Loan. Steve Walker and Jayson Stebbins will enter into negotiations to see if they can bring on some of the orphaned production staff.

a. Motion: Darryl moves to authorize Steve Walker and Jayson Stebbins to pursue the production opportunities with America's Brokers Conduit.

b. Discussion:

    i. Darryl Fry – If the opportunity is going to go away, then we should move as fast as possible.

    ii. Jayson Stebbins – Once we expressed that we were not interested in the operations, then half of the opportunities fell away. Formal negotiations may not be to our advantage. Recruiting the AE's one at a time may be more advantageous. Specific AE market: Bellevue. Specific Sales Team markets: Jacksonville, Navato and Huston.

c. Seconded by Jayson Stebbins

d. Passed by unanimous vote

5. Subject: Regarding ComUnity Lending Board of Director Resolution dated November 28, 2005. Resolution subject: In the event of Darryl Fry's death, a certain percentage of stock ownership would be issued to the Leadership of ComUnity Lending in an attempt to hold together the ComUnity Lending Leadership Team. Since that time, changes to ComUnity Lending's Leadership have been made and the stock distribution needs to be modified.

a. Motion: Darryl moves to change and amend the unanimous written consent of the Board of Directors dated November 28, 2005 to include distribution of stock ownership in the event of his death to 10% to Jayson Stebbins, 10% to Janene Towner, 8% to Gwenn Tyler, 4% to Chito Schupp, eliminate Thai Nguyen at his previous level of 6% because he is no longer a part of the Leadership Team, Allen Christensen would remain at 2% and Derek Long would remain at 2%.

b. Seconded by Janene Towner

c. Discussion:

**ComUnity Lending, Incorporated**
**Board of Directors Meeting**
**August 10, 2007**

　　　i. Darryl – Open to suggestions if you feel there should be a different distribution. Discussion of putting Allen at zero, Gwenn at 7% and Chito at 5%.

　　　ii. Janene – Future modifications can be made? Darryl's answer was yes.

　　　iii. Allen's and Chito's positions with ComUnity Lending and their shares of stock ownership in ComUnity Lending were discussed by the three Board members.

　　d. Modified Motion: Darryl revised the motion to read: Darryl moves to change and amend the unanimous written consent of the Board of Directors dated November 28, 2005 to include distribution of stock ownership in the event of his death to 11% to Jayson Stebbins, 11% to Janene Towner, 7% to Gwenn Tyler, 2% to Derek Long, 0% to Allen Christensen, 5% to Chito Schupp and eliminate Corky Watts who is no longer a part of the company and Thai Nguyen who is no longer on the Leadership Team.

　　e. Modification seconded by Janene Towner

　　f. Passed by unanimous vote

6. Subject: ComUnity Lending has been working with The Winter Group to securitize approximately 20 million dollars ($20,000,000) worth of aged, impaired, troubled loans.

　　a. Motion: Darryl Fry moves to authorize the officers of the ComUnity Lending, Inc. to enter into the securitizing of those loans taking a loss piece to be determined and potentially financing up to 30% of the loss piece by The Winter Group.

　　b. Seconded by Jayson Stebbins

　　c. Passed by unanimous vote

7. Subject: Chito Schnupp to enter into a contract on behalf of ComUnity Lending with Optimum Source Inc. The OSI Team to implement the E-scrubbing project for the purpose of EDI.

　　a. Motion: Darryl Fry moves to ratify the contract that Chito Schnupp entered into with Optimum Source Inc. for E-Scrubbing on behalf of ComUnity Lending.

　　b. Seconded by Janene Towner

　　c. Passed by unanimous vote

8. Subject: Forbearance agreement between ComUnity Lending and GMAC-RFC.

　　a. Motion: Darryl Fry moves that the Board ratify the forbearance agreement between ComUnity Lending and GMAC-RFC dated June 11, 2007.

**ComUnity Lending, Incorporated**
**Board of Directors Meeting**
**August 10, 2007**

   b.  Seconded by Jayson Stebbins

   c.  Passed by unanimous vote

9.  Subject:  ComUnity Lending stock options for Brad Hunter.

   a.  Motion:  Jayson Stebbins moves to grate Brad Hunter 20,000 shares of ComUnity Lending stock options with a 3 year vesting period at current strike price.

   b.  Seconded by Darryl Fry

   c.  Passed by unanimous vote

10. Subject:  Top Hat – The legal changes to the Top Hat Plan were discussed in detail.

   a.  Motion:  Darryl Fry moves to terminate the Top Hat plan in 2007.

   b.  Seconded by Janene Towner

   c.  Passed by unanimous vote

Adjourn: 10:05 AM

_____
Janene Towner, Secretary

Approved:

_____
President                                    W. Darryl Fry,

1  JOHN WALSHE MURRAY (074823)
   ROBERT A. FRANKLIN (091653)
2  DORIS A. KAELIN (162069)
   JENNY L. FOUNTAIN (226241)
3  MURRAY & MURRAY
   A Professional Corporation
4  19400 Stevens Creek Blvd., Suite 200
   Cupertino, CA 95014-2548
5  Telephone:  (650) 852-9000; (408) 907-9200
   Facsimile:   (650) 852-9244
6  Email:  jwmurray@murraylaw.com
   Email:  rfranklin@murraylaw.com
7  Email:  dkaelin@murraylaw.com
   Email:  jlfountain@murraylaw.com

8  Attorneys for Defendant ComUnity Lending, Inc.

9

10                    UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12
   MAI CHRISTINA PHAM, JOHN PHAM, MAI          )   Case No. C07-05436 JW (HRL)
13 NGUYEN, AND HUNG PERRY NGUYEN               )
                                               )
14                    PLAINTIFFS               )   Date:   December 4, 2007
                                               )   Time:   1:30 p.m.
15 VS.                                         )   Place:  United States District Court
                                               )           280 S. First Street
16 COMUNITY LENDING, INCORPORATED, A          )           San Jose, CA
   CALIFORNIA CORPORATION, ETC.                )   Judge:  Honorable James Ware
17                                             )
                      DEFENDANT.               )
18                                             )

19

20                            EXHIBIT "E" TO

21            DECLARATION OF RICHARD G. COUCH IN SUPPORT
          OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

22

23

24

25

26

27

28

**Towner, Janene**

| | |
|---|---|
| **From:** | Towner, Janene |
| **Sent:** | Tuesday, September 04, 2007 10:32 AM |
| **To:** | Leadership |
| **Cc:** | Wong, Barbara |
| **Subject:** | FW: Top Hat |

We held a conference call about TopHat plan termination last week.  Here are the confirmed answers to my questions.

Do you want me to announce the plan termination to the TopHat participants?  We are already getting hardship withdrawl requests and questions.
I would like to discuss today before I proceed.

*Janene Towner*
*ComUnity Lending, Inc.*
*Executive Vice President/COO*

*408.465.8655 - Office*
*408.835.3246 - Cell*
*408.776.0272 - Fax*

*We build quality, innovative partnerships to take Mortgages Across America*

---

**From:** Skriver, Tami [mailto:TSkriver@divinvest.com]
**Sent:** Friday, August 31, 2007 1:32 PM
**To:** Towner, Janene
**Cc:** McClintic, Linda; Skriver, Tami
**Subject:** RE: Top Hat

Janene – I have confirmed the below answers.  I hope you have a wonderful Holiday Weekend!!!

Tami K. Skriver, Manager-Client Management
Transamerica Retirement Services
1-800-755-5803 x6831 or 319-355-6831
tskriver@divinvest.com
Registered Representative
Securities offered through Diversified Investors Securities Corp ("DISC"), Member NASD
4333 Edgewood Rd NE  Cedar Rapids, IA  52499
Diversified Investment Advisors is an affiliate of DISC

---

**From:** Towner, Janene [mailto:janene.towner@comunitylending.com]
**Sent:** Wednesday, August 29, 2007 11:25 PM
**To:** Skriver, Tami
**Subject:** Top Hat

Hi Tammy,

Thank you for your time yesterday.  Please consider this email as our written request to terminate our Top Hat plan.

I would like to clarify my notes from our conference call.

1. Request termination of the plan in writing (this email)*[Skriver, Tami]* Correct and Received
2. Create a board resolution*[Skriver, Tami]* Yes, stating your intent to terminate along with the date
3. Notify participants of plan termination (effective date)*[Skriver, Tami]* Correct
4. Upon notification deferrals are no longer allowed*[Skriver, Tami]* Correct
5. We cannot set up a new plan for 3 years*[Skriver, Tami]* Correct
6. Taxable income in the year paid for the participant*[Skriver, Tami]* Correct
7. Deductible in the year paid for the employer*[Skriver, Tami]* Correct
8. Participants cannot roll over funds*[Skriver, Tami]* Correct
9. If a participant terminates employment before the announcement of the plan termination, it is treated like a normal employment termination*[Skriver, Tami]* Correct
10. Deferrals made prior to 1/05 can be distributed upon plan termination (approx $3,690,352) based on the distribution schedule as chosen by the participant. *[Skriver, Tami]* Correct
11. Deferrals made after 1/05 must be taken in one lump sum but the earliest payout of these funds (approx $1,601,357) is 12 months after plan termination date. *[Skriver, Tami]* Correct
13. All deferrals must be paid out within 24 months of plan termination (even if participant opted for a 5 year payout).*[Skriver, Tami]* Correct

If my notes are incorrect, please clarify the correct information and let me know what the next steps are.

Thanks again,

Janene Towner
Executive Vice President/COO
ComUnity Lending, Inc.
408-465-8655t

This transmission is intended only for the addressee, and may contain privileged and/or confidential information. If you are not the intended recipient, you are expressly prohibited from using, disseminating or copying this material. If you have received this transmission in error, please delete or destroy this and any copies (digital or paper).

Thank You.
ARCHIVING NOTICE: Recipients should be aware that all emails exchanged with the send automatically archived and may be accessed at any time by duly authorized persons an be produced to other parties, including public authorities, in compliance with appli

**CONFIDENTIALITY NOTICE ---------------------- This transmission is intended for the sole use of the individual and/or entity to whom it is addressed, and may contain information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this transmission is not the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, duplication or the taking of any action in reliance on the contents of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. If your receipt of this transmission is in error, please notify the sender by replying immediately to this transmission and destroying the transmission. For your protection, do not include Social Security numbers, passwords or other non-public and personal information in your email. Thank you**

9/4/2007

1  JOHN WALSHE MURRAY (074823)
   ROBERT A. FRANKLIN (091653)
2  DORIS A. KAELIN (162069)
   JENNY L. FOUNTAIN (226241)
3  MURRAY & MURRAY
   A Professional Corporation
4  19400 Stevens Creek Blvd., Suite 200
   Cupertino, CA 95014-2548
5  Telephone:  (650) 852-9000; (408) 907-9200
   Facsimile:  (650) 852-9244
6  Email:  jwmurray@murraylaw.com
   Email:  rfranklin@murraylaw.com
7  Email:  dkaelin@murraylaw.com
   Email:  jlfountain@murraylaw.com
8
   Attorneys for Defendant ComUnity Lending, Inc.
9

10                  UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12
   MAI CHRISTINA PHAM, JOHN PHAM, MAI        )   Case No. C07-05436 JW (HRL)
13 NGUYEN, AND HUNG PERRY NGUYEN             )
                                             )
14                  PLAINTIFFS               )   Date:   December 4, 2007
                                             )   Time:   1:30 p.m.
15 VS.                                       )   Place:  United States District Court
                                             )           280 S. First Street
16 COMUNITY LENDING, INCORPORATED, A         )           San Jose, CA
   CALIFORNIA CORPORATION, ETC.              )   Judge:  Honorable James Ware
17                                           )
                    DEFENDANT.               )
18                                           )

19

20                       EXHIBIT "F" TO

21           DECLARATION OF RICHARD G. COUCH IN SUPPORT
        OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

22

23

24

25

26

27

28

**Towner, Janene**

| | |
|---|---|
| **From:** | Skriver, Tami [TSkriver@divinvest.com] |
| **Sent:** | Thursday, September 06, 2007 2:07 PM |
| **To:** | Towner, Janene |
| **Subject:** | FW: Top Hat |

Here is what I heard back.....I will call you shortly.  Thanks!

**Tami K. Skriver, Manager–Client Management**
**Transamerica Retirement Services**
**1-800-755-5803 x6831 or 319-355-6831**
**tskriver@divinvest.com**
Registered Representative
Securities offered through Diversified Investors Securities Corp ("DISC"), Member NASD
**4333 Edgewood Rd NE  Cedar Rapids, IA  52499**
Diversified Investment Advisors is an affiliate of DISC

**From:** Gerber, Melanie
**Sent:** Thursday, September 06, 2007 1:17 PM
**To:** Skriver, Tami
**Subject:** RE: Top Hat

It looks fine but they need to have their legal counsel review since we cannot give legal or tax advice outside the company.
Thanks,
**Melanie Gerber**
Diversified Investment Advisors
4 Manhattanville Road
Purchase, NY 10577
914-697-8385
gerberm@divinvest.com


**From:** Skriver, Tami
**Sent:** Thursday, September 06, 2007 2:15 PM
**To:** Skriver, Tami; Gerber, Melanie
**Subject:** RE: Top Hat

Melanie – Just wanted to see if you had a chance to review this?  They would like to sent out today and wanted to know if we had any changes.  Thanks very much!!

**Tami K. Skriver, Manager–Client Management**
**Transamerica Retirement Services**
**1-800-755-5803 x6831 or 319-355-6831**
**tskriver@divinvest.com**
Registered Representative
Securities offered through Diversified Investors Securities Corp ("DISC"), Member NASD
**4333 Edgewood Rd NE  Cedar Rapids, IA  52499**
Diversified Investment Advisors is an affiliate of DISC


**From:** Skriver, Tami

9/7/2007

**Sent:** Wednesday, September 05, 2007 12:33 PM
**To:** Gerber, Melanie
**Subject:** FW: Top Hat

Will you please review?  I am working on getting their list of ppts and forms and will send all at once if you state this is OK or want to make any changes..  Thanks very much!!!

**Tami K. Skriver, Manager-Client Management**
**Transamerica Retirement Services**
**1-800-755-5803 x6831 or 319-355-6831**
**tskriver@divinvest.com**
Registered Representative
Securities offered through Diversified Investors Securities Corp ("DISC"), Member NASD
**4333 Edgewood Rd NE  Cedar Rapids, IA  52499**
Diversified Investment Advisors is an affiliate of DISC

---

**From:** Towner, Janene [mailto:janene.towner@comunitylending.com]
**Sent:** Wednesday, September 05, 2007 11:38 AM
**To:** Skriver, Tami
**Cc:** McClintic, Linda; Wong, Barbara
**Subject:** RE: Top Hat

Here is a copy of our announcement. Please feel free to modify it if something is wrong or not clear.  I will send it out today once I get your ok.  Please send the required distribution form as well as the list of participants and their current balances.  Thank you.

*Janene Towner*
*ComUnity Lending, Inc.*
*Executive Vice President/COO*

*408.465.8655 - Office*
*408.835.3246 - Cell*
*408.776.0272 - Fax*

*We build quality, innovative partnerships to take Mortgages Across America*

**From:** Skriver, Tami [mailto:TSkriver@divinvest.com]
**Sent:** Tuesday, September 04, 2007 11:33 AM
**To:** Towner, Janene
**Cc:** McClintic, Linda
**Subject:** RE: Top Hat

Janene – I am verifying if this would be handled the same way as we would handle a 401(k) plan termination as this will impact my answer to your first question.

The only other item needed along with the announcement is the board resolution stating your intent to terminate along with the date.

Thanks very much!!!

**Tami K. Skriver, Manager-Client Management**
**Transamerica Retirement Services**
**1-800-755-5803 x6831 or 319-355-6831**
**tskriver@divinvest.com**
Registered Representative
Securities offered through Diversified Investors Securities Corp ("DISC"), Member NASD
**4333 Edgewood Rd NE  Cedar Rapids, IA  52499**

9/7/2007

Diversified Investment Advisors is an affiliate of DISC

---

**From:** Towner, Janene [mailto:janene.towner@comunitylending.com]
**Sent:** Tuesday, September 04, 2007 12:37 PM
**To:** Skriver, Tami
**Cc:** McClintic, Linda
**Subject:** RE: Top Hat

Thank you.

Once we announce termination of the plan how quickly can the participants receive their funds (those with elections prior to 1/05)?

Do you need anything else from me other than a copy of my announcement?

*Janene Towner*
*ComUnity Lending, Inc.*
*Executive Vice President/COO*

*408.465.8655 - Office*
*408.835.3246 - Cell*
*408.776.0272 - Fax*

*We build quality, innovative partnerships to take Mortgages Across America*

---

**From:** Skriver, Tami [mailto:TSkriver@divinvest.com]
**Sent:** Friday, August 31, 2007 1:32 PM
**To:** Towner, Janene
**Cc:** McClintic, Linda; Skriver, Tami
**Subject:** RE: Top Hat

Janene – I have confirmed the below answers. I hope you have a wonderful Holiday Weekend!!!

Tami K. Skriver, Manager-Client Management
Transamerica Retirement Services
1-800-755-5803 x6831 or 319-355-6831
tskriver@divinvest.com
Registered Representative
Securities offered through Diversified Investors Securities Corp ("DISC"), Member NASD
4333 Edgewood Rd NE  Cedar Rapids, IA  52499
Diversified Investment Advisors is an affiliate of DISC

---

**From:** Towner, Janene [mailto:janene.towner@comunitylending.com]
**Sent:** Wednesday, August 29, 2007 11:25 PM
**To:** Skriver, Tami
**Subject:** Top Hat

Hi Tammy,

Thank you for your time yesterday. Please consider this email as our written request to terminate our Top Hat plan.

I would like to clarify my notes from our conference call.

1. Request termination of the plan in writing (this email)*[Skriver, Tami]* Correct and Received
2. Create a board resolution*[Skriver, Tami]* Yes, stating your intent to terminate along with the date

3.  Notify participants of plan termination (effective date)*[Skriver, Tami]* Correct
4.  Upon notification deferrals are no longer allowed*[Skriver, Tami]* Correct
5.  We cannot set up a new plan for 3 years*[Skriver, Tami]* Correct
6.  Taxable income in the year paid for the participant*[Skriver, Tami]* Correct
7.  Deductible in the year paid for the employer*[Skriver, Tami]* Correct
8.  Participants cannot roll over funds*[Skriver, Tami]* Correct
9.  If a participant terminates employment before the announcement of the plan termination, it is treated like a normal employment termination*[Skriver, Tami]* Correct
10. Deferrals made prior to 1/05 can be distributed upon plan termination (approx $3,690,352) based on the distribution schedule as chosen by the participant. *[Skriver, Tami]* Correct
11. Deferrals made after 1/05 must be taken in one lump sum but the earliest payout of these funds (approx $1,601,357) is 12 months after plan termination date. *[Skriver, Tami]* Correct
13. All deferrals must be paid out within 24 months of plan termination (even if participant opted for a 5 year payout).*[Skriver, Tami]* Correct

If my notes are incorrect, please clarify the correct information and let me know what the next steps are.

Thanks again,

Janene Towner
Executive Vice President/COO
ComUnity Lending, Inc.
408-465-8655t

This transmission is intended only for the addressee, and may contain privileged and/or confidential information. If you are not the intended recipient, you are expressly prohibited from using, disseminating or copying this material. If you have received this transmission in error, please delete or destroy this and any copies (digital or paper).

Thank You.
ARCHIVING NOTICE: Recipients should be aware that all emails exchanged with the send automatically archived and may be accessed at any time by duly authorized persons an be produced to other parties, including public authorities, in compliance with appli
ARCHIVING NOTICE: Recipients should be aware that all emails exchanged with the send automatically archived and may be accessed at any time by duly authorized persons an be produced to other parties, including public authorities, in compliance with appli

**CONFIDENTIALITY NOTICE --------------------- This transmission is intended for the sole use of the individual and/or entity to whom it is addressed, and may contain information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this transmission is not the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, duplication or the taking of any action in reliance on the contents of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. If your receipt of this transmission is in error, please notify the sender by replying immediately to this transmission and destroying the transmission. For your protection, do not include Social Security numbers, passwords or other non-public and personal information in your email. Thank you**

9/7/2007

This transmission is intended only for the addressee, and may contain privileged and/or confidential information. If you are not the intended recipient, you are expressly prohibited from using, disseminating or copying this material. If you have received this transmission in error, please delete or destroy this and any copies (digital or paper).

Thank You.

CONFIDENTIALITY NOTICE ---------------------- This transmission is intended for the sole use of the individual and/or entity to whom it is addressed, and may contain information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this transmission is not the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, duplication or the taking of any action in reliance on the contents of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. If your receipt of this transmission is in error, please notify the sender by replying immediately to this transmission and destroying the transmission. For your protection, do not include Social Security numbers, passwords or other non-public and personal information in your email. Thank you

This transmission is intended only for the addressee, and may contain privileged and/or confidential information. If you are not the intended recipient, you are expressly prohibited from using, disseminating or copying this material. If you have received this transmission in error, please delete or destroy this and any copies (digital or paper).

Thank You.
ARCHIVING NOTICE: Recipients should be aware that all emails exchanged with the send automatically archived and may be accessed at any time by duly authorized persons an be produced to other parties, including public authorities, in compliance with appli

CONFIDENTIALITY NOTICE ---------------------- This transmission is intended for the sole use of the individual and/or entity to whom it is addressed, and may contain information and/or attachments that are privileged, confidential and exempt from disclosure under applicable law. If the reader of this transmission is not the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, duplication or the taking of any action in reliance on the contents of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. If your receipt of this transmission is in error, please notify the sender by replying immediately to this transmission and destroying the transmission. For your protection, do not include Social Security numbers, passwords or other non-public and personal information in your email. Thank you

9/7/2007

1
JOHN WALSHE MURRAY (074823)
ROBERT A. FRANKLIN (091653)
2
DORIS A. KAELIN (162069)
JENNY L. FOUNTAIN (226241)
3
MURRAY & MURRAY
A Professional Corporation
4
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
5
Telephone:  (650) 852-9000; (408) 907-9200
Facsimile:   (650) 852-9244
6
Email:  jwmurray@murraylaw.com
Email:  rfranklin@murraylaw.com
7
Email:  dkaelin@murraylaw.com
Email:  jlfountain@murraylaw.com
8
9
Attorneys for Defendant ComUnity Lending, Inc.

10
UNITED STATES DISTRICT COURT

11
NORTHERN DISTRICT OF CALIFORNIA

12

13
MAI CHRISTINA PHAM, JOHN PHAM, MAI
NGUYEN, AND HUNG PERRY NGUYEN

14
PLAINTIFFS

15
VS.

16
COMUNITY LENDING, INCORPORATED, A
CALIFORNIA CORPORATION, ETC.

17

18
DEFENDANT.

Case No. C07-05436 JW (HRL)

Date:   December 4, 2007
Time:   1:30 p.m.
Place:  United States District Court
          280 S. First Street
          San Jose, CA
Judge:  Honorable James Ware

19

20
EXHIBIT "G" TO

21
DECLARATION OF RICHARD G. COUCH IN SUPPORT
OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

22

23

24

25

26

27

28

**Towner, Janene**

| | |
|---|---|
| **From:** | Towner, Janene |
| **Sent:** | Friday, September 07, 2007 10:46 AM |
| **To:** | Towner, Janene |
| **Subject:** | Top Hat |
| **Attachments:** | TOP HAT TERM ANNOUNCEMENT.doc |

Effective, September 4, 2007 we are terminating the Top Hat plan.  Attached is the announcement with distribution forms to follow.

*Janene Towner*
*ComUnity Lending, Inc.*
*Executive Vice President/COO*

*408.465.8655 - Office*
*408.835.3246 - Cell*
*408.776.0272 - Fax*

*We build quality, innovative partnerships to take Mortgages Across America*

# ANNOUNCEMENT

September 4, 2007

To:     TopHat Participants

From:   Janene Towner
        ComUnity Lending, Inc.

CC:     Tami Skriver, Transamerica

Please consider this announcement as your notification of the termination of ComUnity Lending's TopHat Deferred Compensation Plan effective September 4, 2007.

**Important information you need to know:**

1. Deferrals are no longer allowed.
2. Upon distribution, participants cannot roll over funds and the distribution will be treated as taxable income in the year the distribution is made.
3. Distributions will be made based on the payment options chosen by you (over time or a lump sum distribution) with the exception of deferrals made after January 1, 2005 which must be taken in a lump sum.
4. Deferrals made prior to January 1, 2005 will be distributed within 30 days.
5. Deferrals made after January 1, 2005 cannot be paid prior to September 4, 2008 and must be paid no later than September 4, 2009 (regardless of payment option chosen).
6. All deferrals must be paid out within 24 months of plan termination.

If you have further questions, please contact the Transamerica Customer Care Center at 877-234-9293.



**TRANSAMERICA**
RETIREMENT SERVICES

4333 Edgewood Road NE
Cedar Rapids, IA 52499
877-234-9293
www.ta-retirement.com

**Distribution Request**
**Termination of Employment/Retirement**

## Instructions

To request a distribution, complete all applicable sections of this form, obtain any required signatures, and return the form to Transamerica at the above address. Do not use this form to request a direct rollover to an IRA or an eligible retirement plan; instead complete a Direct Rollover Request (Form No. 2214-TA), or log on to www.ta-retirement.com for forms and information on rolling over your account balance to a Transamerica IRA.

## Section A. Employer Information

Company/Employer Name: COM UNITY LENDING INC.

Contract/Account No. YQ51291          Affiliate No. 00001          Division No.

## Section B. Participant Information

Last Name:                           Date of Birth:

First Name/MI:                       Social Security No.:

Mailing Address:

City:                                State:

Zip Code:

Phone No./Ext.:

E-mail Address:

## Section C. Distribution Information

Reason for distribution:   ☐ Termination of employment     ☐ Retirement

Amount of distribution:   ☐ 100%   or   ☐ $_____, remainder to be:   ☐ Left on deposit   ☐ Other _____

### Distribution Options

☐ Leave funds on deposit

☐ Purchase annuity

☐ Lump sum distribution

☐ Partial distribution

☐ In-kind distribution of any employer stock *(distribution will be in full shares only; partial shares will be paid in cash)*

☐☐☐☐ Deposit Transfer Corp. No. *(from new financial institution, so stock can be transferred without issuing certificates)*

☐ Flexible Distribution Options *(available if leaving funds on deposit)*

  ☐ Fixed Payment $_____ *(amount)*

  ☐ Fixed Payment over _____ years

  ☐ Life Expectancy   ☐ Single   ☐ Joint *(proof of spouse's age required)*

  Payment commencement month: _____

  Payment frequency:

  ☐ Monthly   ☐ Quarterly   ☐ Semi-Annual   ☐ Annual

*Note: Please refer to your Summary Plan Description or contact your Plan Administrator for more information regarding the distribution options that are available under the plan.*

### Payment Options

☐ Check   or   ☐ Wire transfer *(Complete information below only if wire transfer option is selected. Option available only for lump sum or partial distribution of at least $5,000. Any distribution less than $5,000 will be processed in the form of a check.)*

ABA No. ☐☐☐☐☐☐☐☐☐

Institution Name _____

Institution Address _____

Account Name _____

Account No. _____

"Further Credit To" Institution Name _____
*(For wire to credit union or overseas bank, call Transamerica for additional information.)*

*Note: If one of the above payment options is not selected, this distribution will be processed in the form of a check.*

**Section D. Outstanding Loan Options** (if applicable)

For any outstanding loan(s) at the time of my termination of employment/retirement, I elect to:

☐  Pay off the loan(s). *(Call Transamerica to verify loan payoff amount and procedure prior to submitting this form.)*

☐  Continue loan repayments via loan coupons. *(Available if funds are left on deposit and if allowed by the plan. Call Transamerica for further information.)*

☐  Default the loan(s). I understand that a taxable distribution will be reported to the IRS as indicated in the Special Tax Notice Regarding Plan Payments.

*Note: If one of the above options is not selected, any outstanding loan(s) will be automatically defaulted in accordance with federal regulations.*

**Section E. Tax Withholding Election**

**Mandatory Federal Income Tax Withholding** - If this distribution is an eligible rollover distribution, 20% mandatory federal income tax withholding applies unless the distribution is paid as a direct rollover to an eligible retirement plan or IRA.

**Optional Federal Income Tax Withholding** - If this distribution is not an eligible rollover distribution, 10% federal income tax will be withheld unless you elect otherwise. If this distribution is subject to the 20% mandatory federal income tax withholding, do not check below since it does not apply.

☐  Do not withhold 10% optional federal income tax

**State Income Tax Withholding** - Withholding is mandatory in some states. Other states allow an independent election and in these states, state tax will be withheld unless you elect otherwise.

☐  Do not withhold state income tax (if independent election is permitted)

**Section F. Participant Signature**

*Please note: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim from a group annuity contract issued in New York, containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed $5,000 and the stated value of the claim for each such violation. States other than New York also have insurance fraud statutes, which impose penalties for any violation thereof.*

**For Married Participants:** I elect to waive qualified joint and survivor benefits (if applicable) with respect to the amount to be withdrawn from the plan. I understand that this waiver is not effective without the written consent (if applicable) of my spouse, witnessed by my Plan Administrator or a Notary Public.

**For All Participants:** I understand that I may have to report this distribution to the IRS and pay appropriate income taxes on the taxable portion not rolled over. I have received and read the Special Tax Notice Regarding Plan Payments. I certify that the information provided on this form is correct and complete.

X _____     _____     _____
      Participant Signature                              Date                    Print Name and Social Security Number

**Section G. Spousal Consent** (if applicable)

I consent to my spouse's waiver of joint and survivorship benefits with respect to the amount to be withdrawn from the plan. I understand that this consent means that I will not receive any survivor benefits under this plan upon my spouse's death with respect to this amount. I understand that I do not have to consent to the waiver of this qualified joint and survivor annuity coverage, however, if I do consent by signing below, I may not revoke my consent.

WITNESSED

X _____     _____     X _____     _____
      Spouse Signature                              Date            Plan Administrator Signature or Notary Public Signature and Stamp/Seal         Date

**Section H. Plan Administrator Information and Signature**

Vested %: _____          Employment status:   ☐ Terminated _____          ☐ Retired _____
                                                                                        Termination Date                                             Retirement Date

Have all contributions been remitted?   ☐ Yes   ☐ No

Period end date of final contribution _____          *(Processing will be delayed until final contribution is received.)*

*Note: This distribution request cannot be processed unless all applicable sections of this form have been completed.*

I certify that the information provided on this form is correct and complete, this transaction is permissible under the plan, and that any required consents and waivers have been obtained.

X _____     _____
      Plan Administrator Signature                    Date



4333 Edgewood Road NE
Cedar Rapids, IA 52499
877-234-9293
www.ta-retirement.com

**Special Tax Notice Regarding Plan
Payments For Qualified and 403(b) Plans**

This notice explains how you can continue to defer federal income tax on your retirement savings in the plan and contains important information you will need before you decide how to receive your plan benefits.

This notice is provided to you by your Plan Administrator because all or part of the payment that you will soon receive from the plan may be eligible for rollover by you or your Plan Administrator to a traditional IRA or an eligible employer plan. A rollover is a payment by you or the Plan Administrator of all or part of your benefit to another plan or IRA that allows you to continue to postpone taxation of that benefit until it is paid to you. Your payment cannot be rolled over to a SIMPLE IRA or a Coverdell Education Savings Account (formerly known as an education IRA). Your payment can be rolled over to a Roth IRA only if such payment is from a Roth account in the plan. An "eligible employer plan" includes a plan qualified under section 401(a) of the Internal Revenue Code, including a 401(k) plan, profit-sharing plan, defined benefit plan, stock bonus plan, and money purchase plan; a section 403(a) annuity plan; a section 403(b) tax-sheltered annuity; and an eligible section 457(b) plan maintained by a governmental employer (governmental 457 plan).

An eligible employer plan is not legally required to accept a rollover. Before you decide to roll over your payment to another employer plan, you should find out whether the plan accepts rollovers and, if so, the types of distributions it accepts as a rollover. You should also find out about any documents that are required to be completed before the receiving plan will accept a rollover. Even if a plan accepts rollovers, it might not accept rollovers of certain types of distributions, such as after-tax amounts. If this is the case, and your distribution includes after-tax amounts, you may wish instead to roll your distribution over to a traditional IRA or split your rollover amount between the employer plan in which you will participate and a traditional IRA. If an employer plan accepts your rollover, the plan may restrict subsequent distributions of the rollover amount or may require your spouse's consent for any subsequent distribution. A subsequent distribution from the plan that accepts your rollover may also be subject to different tax treatment than distributions from this plan. Check with the Plan Administrator of the plan that is to receive your rollover prior to making the rollover.

If you have additional questions after reading this notice, you can contact your Plan Administrator.

### Summary

There are two ways you may be able to receive a plan payment that is eligible for rollover:

(1) Certain payments can be made directly to a traditional IRA or Roth IRA (if your plan payment is from a Roth account) that you establish or to an eligible employer plan that will accept it and hold it for your benefit ("DIRECT ROLLOVER"); or

(2) The payment can be PAID TO YOU.

**If you choose a DIRECT ROLLOVER:**

● Your payment will not be taxed in the current year and no income tax will be withheld.

● You choose whether your payment will be made directly to your traditional IRA or to an eligible employer plan that accepts your rollover. Your payment cannot be rolled over to a Roth IRA (unless your payment is from a Roth account in the plan), a SIMPLE IRA, or a Coverdell Education Savings Account.

● The taxable portion of your payment will be taxed later when you take it out of the traditional IRA or the eligible employer plan. Your payment from a Roth IRA of any earnings will be taxable unless it is considered a "qualified distribution". Depending on the type of eligible employer plan, the later distribution may be subject to different tax treatment than it would be if you received a taxable distribution from the plan.

**If you choose to have a plan payment that is eligible for rollover PAID TO YOU:**

● You will receive only 80% of the taxable amount of the payment, because the Plan Administrator is required to withhold 20% of that amount and send it to the IRS as taxable income withholding to be credited against your taxes.

● The taxable amount of your payment will be taxed in the current year unless you roll it over. Under limited circumstances, you may be able to use special tax rules that could reduce the tax you owe. However, if you receive the payment before age 59 1/2, you may have to pay an additional 10% tax.

● You can roll over all or part of the payment by paying it to your traditional IRA, Roth IRA (if your payment was from a Roth account in the plan) or to an eligible employer plan that accepts your rollover within 60 days after you receive the payment. The amount rolled over will not be taxed until you take it out of the traditional IRA or the eligible employer plan; if the payment is a qualified distribution from a Roth IRA, it will not be taxed on withdrawal.

● If you want to roll over 100% of the payment to a traditional IRA or an eligible employer plan, *you must find other money to replace the 20% of the taxable portion that was withheld.* If you roll over only the 80% that you received, you will be taxed on the 20% that was withheld and that is not rolled over.

**Your Right to Waive the 30-Day Notice Period** Generally, neither a direct rollover nor a payment can be made from the plan until at least 30 days after your receipt of this notice. Thus, after receiving this notice, you have at least 30 days to consider whether or not to have your withdrawal directly rolled over. If you do not wish to wait until this 30-day notice period ends before your election is processed, you may waive the notice period by making an affirmative election indicating whether or not you wish to make a direct rollover. Your withdrawal will then be processed in accordance with your election as soon as practical after it is received by the Plan Administrator.

### More Information

I.   Payments That Can And Cannot Be Rolled Over
II.  Direct Rollover
III. Payment Paid To You
IV.  Surviving Spouses, Alternate Payees, And Other Beneficiaries

## I. Payments That Can And Cannot Be Rolled Over

Payments from the plan may be "eligible rollover distributions". This means they can be rolled over to a traditional IRA, Roth IRA (if your plan payment was from a Roth account in the plan) or to an eligible employer plan that accepts rollovers. Payments from a plan cannot be rolled over to a SIMPLE IRA or a Coverdell Education Savings Account. Your Plan Administrator should be able to tell you what portion of your payment is an eligible rollover distribution.

**After-tax Contributions**  If you made non-Roth after-tax contributions to the plan, these contributions may be rolled into either a traditional IRA or to certain employer plans that accept rollovers of the after-tax contributions. The following rules apply:

**a) Rollover into a Traditional IRA**  You can roll over your after-tax contributions to a traditional IRA either directly or indirectly. Your Plan Administrator should be able to tell you how much of your payment is the taxable portion and how much is the after-tax portion.

If you roll over after-tax contributions to a traditional IRA, it is your responsibility to keep track of, and report to the IRS on the applicable forms, the amount of these after-tax contributions. This will enable the nontaxable amount of any future distributions from the traditional IRA to be determined.

Once you roll over your after-tax contributions to a traditional IRA, those amounts CANNOT later be rolled over to an employer plan.

*Note: Roth after-tax contributions to a plan can be rolled over to a Roth IRA.*

**b) Rollover into an Employer Plan**  You can roll over after-tax contributions from an employer plan that is qualified under Code section 401(a), from a section 403(a) annuity plan or from a 403(b) tax-sheltered annuity (if the plan allows) to another such plan using a direct rollover if the other plan provides separate accounting for amounts rolled over, including separate accounting for the after-tax employee contributions and earnings on those contributions. You can also roll over after-tax contributions from a section 403(b) tax-sheltered annuity, from an employer plan that is qualified under Code Section 401(a) or from a Section 403(a) annuity plan (if the plan allows) to another section 403(b) tax-sheltered annuity using a direct rollover if the other tax-sheltered annuity provides separate accounting for amounts rolled over, including separate accounting for the after-tax employee contributions and earnings on those contributions. You CANNOT roll over after-tax contributions to a governmental 457 plan. If you want to roll over your after-tax contributions to an employer plan that accepts these rollovers, you cannot have the after-tax contributions paid to you first. You must instruct the Plan Administrator to make a direct rollover on your behalf. Also, you cannot first roll over after-tax contributions to a traditional IRA and then roll over that amount into an employer plan.

*Note: Roth after-tax contributions can be rolled over to a Roth account in another eligible plan.*

The following types of payments *cannot* be rolled over :

**Payments Spread Over Long Periods**  You cannot roll over a payment if it is part of a series of equal (or almost equal) payments that are made at least once a year and that will last for:

- your lifetime (or a period measured by your life expectancy), or
- your lifetime and your beneficiary's lifetime (or a period measured by your joint life expectancies), or
- a period of ten years or more.

**Required Minimum Payments**  Beginning when you reach age 70 1/2 or retire, whichever is later, a certain portion of your payment cannot be rolled over because it is a "required minimum payment" that must be paid to you. Special rules apply if you own more than 5% of your employer.

**Hardship Distributions**  A hardship distribution cannot be rolled over.

**ESOP Dividends**  Cash dividends paid to you on employer stock held in an employee stock ownership plan cannot be rolled over.

**Corrective Distributions**  A distribution that is made to correct a failed nondiscrimination test or because legal limits on certain contributions were exceeded cannot be rolled over.

**Loans Treated as Distributions**  The amount of a plan loan that becomes a taxable deemed distribution because of a default cannot be rolled over. However, a loan offset amount is eligible for rollover, as discussed in Part III below. Ask the Plan Administrator if distribution of your loan qualifies for rollover treatment.

The Plan Administrator should be able to tell you if your payment includes amounts which cannot be rolled over.

## II. Direct Rollover

A DIRECT ROLLOVER is a direct payment of the amount of your plan benefits to a traditional IRA, Roth IRA (if your payment is from a Roth account in the plan) or an eligible employer plan that will accept it. You can choose a DIRECT ROLLOVER of all or any portion of your payment that is an eligible rollover distribution, as described in Part I above. You are not taxed on any taxable portion of your payment for which you choose a DIRECT ROLLOVER until you later take it out of the traditional IRA, or eligible employer plan (or Roth IRA and it is not a "qualified distribution"). In addition, no income tax withholding is required for any taxable portion of your plan benefits for which you choose a DIRECT ROLLOVER. The plan might not let you choose a DIRECT ROLLOVER if your distributions for the year are less than $200.

**DIRECT ROLLOVER to a Traditional IRA**  Unless your payment is from a Roth account in the plan, you can open a traditional IRA to receive the direct rollover. If you choose to have your payment made directly to a traditional IRA, contact an IRA sponsor (usually a financial institution) to find out how to have your payment made in a direct rollover to a traditional IRA at that institution. If you are unsure of how to invest your money, you can temporarily establish a traditional IRA to receive the payment. However, in choosing a traditional IRA, you may wish to make sure that the traditional IRA you choose will allow you to move all or a part of your payment to another traditional IRA at a later date, without penalties or other limitations. See IRS Publication 590, Individual Retirement Arrangements, for more information on traditional IRAs (including limits on how often you can roll over between IRAs). Roth IRAs are available for those wishing to open an IRA to receive their Roth account rollover.

**AUTOMATIC ROLLOVER for Certain Mandatory Cash-out Distributions** Generally, if the plan has an involuntary cash-out feature, involuntary cash outs to a terminated employee that are greater than $1,000 but not more than $5,000, for which such individual has made no election, will be rolled over automatically from the plan to a traditional IRA made available by Diversified Investment Advisors or other authorized IRA provider. The plan is permitted, for purposes of the involuntary cash-out rules, to exclude the value of any rollover contributions when determining the terminated employee's vested account balance. The automatic rollover rule, however, applies to the entire vested account balance, even if a portion of the account is attributable to a rollover contribution that would be excluded in determining whether the vested account balance exceeds $5,000 (or such lower cash out limit provided by the plan).

**DIRECT ROLLOVER to a Plan** If you are employed by a new employer that has an eligible employer plan, and you want a direct rollover to that plan, ask the Plan Administrator of that plan whether it will accept your rollover. An eligible employer plan is not legally required to accept a rollover. Even if your new employer's plan does not accept a rollover, you can choose a DIRECT ROLLOVER to a traditional IRA (or Roth IRA, if applicable). If the employer plan accepts your rollover, the plan may provide restrictions on the circumstances under which you may later receive distribution of the rollover amount or may require spousal consent to any subsequent distribution. Check with the Plan Administrator of that plan before making your decision.

**DIRECT ROLLOVER of a Series of Payments** If you receive a payment that can be rolled over to an IRA or an eligible employer plan that will accept it, and it is paid in a series of payments for less than 10 years, your choice to make or not make a DIRECT ROLLOVER for a payment will apply to all later payments in the series until you change your election. You are free to change your election for any later payment in the series.

**Change in Tax Treatment Resulting from a DIRECT ROLLOVER** The tax treatment of any payment from the eligible employer plan or traditional IRA receiving your DIRECT ROLLOVER might be different than if you received your benefit in a taxable distribution directly from the plan. For example, if you were born before January 1, 1936, you might be entitled to ten-year averaging for capital gain treatment, as explained below. However, if you have your benefit rolled over to a section 403(b) tax-sheltered annuity, a governmental 457 plan, or a traditional IRA in a DIRECT ROLLOVER, your benefit will no longer be eligible for that special treatment. See the sections below entitled "Additional 10% Tax if You Are Under Age 59 1/2" and "Special Tax Treatment if You Were Born Before January 1, 1936".

## III. Payment Paid To You

If your payment can be rolled over (see Part I above) and the payment is made to you in cash, it is subject to 20% federal income tax withholding on the taxable portion (state tax withholding may also apply). The payment is taxed in the year you receive it unless, within 60 days, you roll it over to an IRA or an eligible employer plan that accepts rollovers. If you do not roll it over, special tax rules may apply. "Qualified distributions" from a Roth account are not subject to taxation. Qualified distribution from a Roth account in a plan is a distribution made after a 5-taxable year participation period has been met and that is made on account of your attainment of age 59 1/2, death, or becoming disabled (as defined in Section 72(m)(7) of the Internal Revenue Code).

**Mandatory Income Tax Withholding** If any portion of your payment can be rolled over under Part 1 above and you do not elect to make a DIRECT ROLLOVER, the plan is required by law to withhold 20% of the taxable amount. This amount is sent to the IRS as federal income tax withholding. For example, if you can roll over a taxable payment of $10,000, only $8,000 will be paid to you because the plan must withhold $2,000 as income tax. However, when you prepare your income tax return for the year, unless you make a rollover within 60 days (see "Sixty-Day Rollover Option" below), you must report the full $10,000 as a taxable payment from the plan. You must report the $2,000 as tax withheld, and it will be credited against any income tax you owe for the year. There will be no income tax withholding if your payments for the year are less than $200.

**Voluntary Income Tax Withholding** If any portion of your payment is taxable but cannot be rolled over under Part I above, the mandatory withholding rules described above do not apply. In this case, you may elect not to have withholding apply to that portion. If you do nothing, an amount will be taken out of this portion of your payment for federal income tax withholding. To elect out of withholding, ask the Plan Administrator for the election form and related information.

**Sixty-Day Rollover Option** If you receive a payment that can be rolled over under Part I above, you can still decide to roll over all or part of it to an IRA or to an eligible employer plan that accepts rollovers from your plan account. If you decide to roll over, you *must contribute the amount of the payment you received to an IRA or eligible employer plan within 60 days after you receive the payment.* The portion of your payment that is rolled over will not be taxed until you take it out of the traditional IRA or the eligible employer plan. If your rollover was from the plan's Roth account to a Roth IRA or Roth account in another eligible plan, it will be taxed when you take it out later unless it is a "qualified distribution".

You can roll over up to 100% of your payment that can be rolled over under Part I above, including an amount equal to the 20% of the taxable portion that was withheld. If you choose to roll over 100%, you must find other money within the 60-day period to contribute to the traditional IRA or the eligible employer plan, to replace the 20% that was withheld. On the other hand, if you roll over only the 80% of the taxable portion that you received, you will be taxed on the 20% that was withheld.

*Example:* The taxable portion of your payment (other than from a Roth account) that can be rolled over under Part I above is $10,000, and you choose to have it paid to you. You will receive $8,000, and $2,000 will be sent to the IRS as income tax withholding. Within 60 days after receiving the $8,000, you may roll over the entire $10,000 to a traditional IRA or an eligible employer plan. To do this, you roll over the $8,000 you received from the plan, and you will have to find $2,000 from other sources (your savings, a loan, etc.). In this case, the entire $10,000 is not taxed until you take it out of the traditional IRA or an eligible employer plan. If you roll over the entire $10,000, when you file your income tax return you may get a refund of part or all of the $2,000 withheld. If, on the other hand, you roll over only $8,000, the $2,000 you did not roll over is taxed in the year it was withheld. When you file your income tax return, you may get a refund of part of the $2,000 withheld. (However, any refund is likely to be larger if you roll over the entire $10,000.)

**Additional 10% Tax If You Are Under Age 59 1/2** If you receive a payment before you reach age 59 1/2 and you do not roll it over, then, in addition to the regular income tax, you may have to pay an extra tax equal to 10% of the taxable portion of the payment. The additional 10% tax generally does not apply to (1) payments that are paid after you separate from service with your employer during or after the year you reach age 55, (2) payments that are paid because you retire due to disability, (3) payments that are paid as equal (or almost equal) payments over your life or life expectancy (or your and your beneficiary's lives or life expectancies), (4) dividends paid with respect to stock by an employee stock ownership plan (ESOP) as described in Code section 404(k), (5) payments that are paid directly to the government to satisfy a federal tax levy, (6) payments that are paid to an alternate payee under a qualified domestic relations order, or (7) payments that do not exceed the amount of your deductible medical expenses. See IRS Form 5329 for more information on the additional 10% tax.

The additional 10% tax will not apply to distributions from a governmental 457 plan, except to the extent the distribution is attributable to an amount you rolled over to that plan (adjusted for investment returns) from another type of eligible employer plan or IRA. Any amount rolled over from the governmental 457 plan to another type of eligible employer plan or a traditional IRA will become subject to the additional 10% tax if it is distributed to you before you reach age 59 1/2, unless one of the exceptions applies.

**Special Tax Treatment If You Were Born Before January 1, 1936** If you receive a payment from a plan qualified under section 401(a) or a section 403(a) annuity plan that can be rolled over under Part I and you do not roll it over to a traditional IRA or an eligible employer plan, the payment will be taxed in the year you receive it. However, if the payment qualifies as a"lump sum distribution", it may be eligible for special tax treatment. (See also "Employer Stock or Securities", below.) A lump sum distribution is a payment, within one year, of your entire balance under the plan (and certain other similar plans of the employer) that is payable to you after you have reached age 59 1/2 or because you have separated from service with your employer (or, in the case of a self-employed individual, after you have reached age 59 1/2 or have become disabled). For a payment to be treated as a lump sum distribution, you must have been a participant in the plan for at least five years before the year in which you received the distribution. The special tax treatment for lump sum distributions that may be available to you is described below.

**Ten Year Averaging** If you receive a lump sum distribution and you were born before January 1, 1936, you can make a one-time election to figure the tax on the payment by using "10-year averaging" (using 1986 tax rates). Ten-year averaging often reduces the tax you owe. (NOTE: 403(b) plans are not eligible for ten-year averaging.)

**Capital Gain Treatment** If you receive a lump sum distribution and you were born before January 1, 1936, and you were a participant in the plan before 1974, you may elect to have the part of your payment that is attributable to your pre-1974 participation in the plan taxed as long-term capital gain at a rate of 20%.

There are other limits on the special tax treatment for lump sum distributions. For example, you can generally elect this special tax treatment only once in your lifetime, and the election applies to all lump sum distributions that you receive in the same year. You may not elect this special tax treatment if you rolled amounts into this plan from a 403(b) tax-sheltered annuity contract, a governmental 457 plan or from an IRA not originally attributable to a qualified employer plan. If you have previously rolled over a distribution from the plan (or certain other similar plans of the employer), you cannot use this special averaging treatment for later payments from the plan. If you roll over your payment to a traditional IRA, governmental 457 plan, or 403(b) tax-sheltered annuity, you will not be able to use special tax treatment for later payments from that IRA, plan, or annuity. Also, if you roll over only a portion of your payment to a traditional IRA, governmental 457 plan, or 403(b) tax-sheltered annuity, this special tax treatment is not available for the rest of the payment. See IRS Form 4972 for additional information on lump sum distributions and how you elect the special tax treatment.

**Employer Stock or Securities** There is a special rule for a payment from the plan that includes employer stock (or other employer securities). To use this special rule, 1) the payment must qualify as a lump sum distribution, as described above, except that you do not need five years of plan participation, or 2) the employer stock included in the payment must be attributable to "after-tax" employee contributions, if any. Under this special rule, you may have the option of not paying tax on the "net unrealized appreciation" of the stock until you sell the stock. Net unrealized appreciation generally is the increase in the value of the employer stock while it was held by the plan. For example, if employer stock was contributed to your plan account when the stock was worth $1,000 but the stock was worth $1,200 when you received it, you would not have to pay tax on the $200 increase in value until you later sold the stock.

You may instead elect not to have the special rule apply to the net unrealized appreciation. In this case, your net unrealized appreciation will be taxed in the year you receive the stock, unless you roll over the stock. The stock can be rolled over to a traditional IRA or another eligible employer plan, either in a direct rollover or a rollover that you make yourself. Generally, you will no longer be able to use the special rule for net unrealized appreciation if you roll the stock over to a traditional IRA or another eligible employer plan.

If you receive only employer stock in a payment that can be rolled over, no amount will be withheld from the payment. If you receive cash or property other .han employer stock, as well as employer stock, in a payment that can be rolled over, the 20% withholding amount will be based on the entire taxable amount paid to you (including the value of the employer stock determined by excluding the net unrealized appreciation). However, the amount withheld will be limited to cash or property (excluding employer stock) paid to you.

If you receive employer stock in a payment that qualifies as a lump sum distribution, the special tax treatment for lump sum distributions described above (such as 10-year averaging) also may apply. See IRS Form 4972 for additional information on these rules.

**Repayment of Plan Loans** If your employment ends and you have an outstanding loan from your plan, your employer may reduce (or "offset") your balance in the plan by the amount of the loan you have not repaid. The amount of your loan offset is generally treated as a distribution to you at the time of the offset and will be taxed unless you roll over an amount equal to the amount of your loan offset to another qualified employer plan or a traditional IRA within 60 days of the date of the offset. (If the loan offset is against your Roth account in the plan, the distribution is a non-qualified distribution and the earnings portion is subject to taxation at the time of the loan offset). If the amount of your loan offset is the only amount you receive or are treated as having received, no amount will be withheld from it. If you receive other payments of cash or property from the plan, the 20% withholding amount will be based on the entire amount paid to you, including the amount of the loan offset. The amount withheld will be limited to the amount of other cash or property paid to you (other than any employer securities). The amount of the defaulted plan loan that is a taxable deemed distribution cannot be rolled over.

## IV. Surviving Spouses, Alternate Payees, And Other Beneficiaries

In general, the rules summarized above that apply to payments to employees also apply to payments to surviving spouses of employees and to spouses or former spouses who are "alternate payees." You are an alternate payee if your interest in the plan results from a "qualified domestic relations order," which is an order issued by a court, usually in connection with a divorce or legal separation.

If you are a surviving spouse or an alternate payee, you may choose to have a payment that can be rolled over, as described in Part I above, paid in a DIRECT ROLLOVER to a traditional IRA or to an eligible employer plan or paid to you. If you have the payment paid to you, you can keep it or roll it over yourself to a traditional IRA or to an eligible employer plan. Thus, you have the same choices as the employee.

If you are a beneficiary other than a surviving spouse or alternate payee, you can choose a direct trustee-to-trustee transfer to an IRA, if your plan allows, but you cannot roll over the payment yourself. The IRA is treated as an 'inherited IRA'.

If you are a surviving spouse, an alternate payee, or another beneficiary, your payment is generally not subject to the additional 10% tax described in Part III above, even if you are younger than age 59 1/2.

If you are a surviving spouse, an alternate payee, or another beneficiary, you may be able to use the special tax treatment for lump sum distributions and the special rule for payments that include employer stock, as described in Part III above. If you receive a payment because of the employee's death, you may be able to treat the payment as a lump sum distribution if the employee met the appropriate age requirements, whether or not the employee has had 5 years of participation in the plan.

**How To Obtain Additional Information**

This notice summarizes only the federal (not state or local) tax rules that might apply to your payment. The rules described above are complex and contain many conditions and exceptions that are not included in this notice. Therefore, you may want to consult with the Plan Administrator or a professional tax advisor before you take a payment of your benefits from your plan. Also, you can find more specific information on the tax treatment of payments from qualified employer plans in IRS Publication 575, Pension and Annuity Income, and IRS Publication 590, Individual Retirement Arrangements. These publications are available from your local IRS office, on the IRS's Internet Web site at www.irs.gov, or by calling 1-800-TAX-FORM.

1   JOHN WALSHE MURRAY (074823)
     ROBERT A. FRANKLIN (091653)
2   DORIS A. KAELIN (162069)
     JENNY L. FOUNTAIN (226241)
3   MURRAY & MURRAY
     A Professional Corporation
4   19400 Stevens Creek Blvd., Suite 200
     Cupertino, CA 95014-2548
5   Telephone:  (650) 852-9000; (408) 907-9200
     Facsimile:   (650) 852-9244
6   Email:  jwmurray@murraylaw.com
     Email:  rfranklin@murraylaw.com
7   Email:  dkaelin@murraylaw.com
     Email:  jlfountain@murraylaw.com
8
     Attorneys for Defendant ComUnity Lending, Inc.
9

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 12 MAI CHRISTINA PHAM, JOHN PHAM, MAI<br>13 NGUYEN, AND HUNG PERRY NGUYEN | Case No. C07-05436 JW (HRL) |
| 14        PLAINTIFFS | Date:   December 4, 2007 |
| 15 VS. | Time:  1:30 p.m.<br>Place:  United States District Court |
| 16 COMUNITY LENDING, INCORPORATED, A<br>CALIFORNIA CORPORATION, ETC. |       280 S. First Street<br>      San Jose, CA |
| 17 | Judge:  Honorable James Ware |
| 18        DEFENDANT. | |

19

20                        EXHIBIT "H" TO

21        DECLARATION OF RICHARD G. COUCH IN SUPPORT
      OF OPPOSITION TO APPLICATION FOR WRIT OF ATTACHMENT

22

23

24

25

26

27

28

# Top Hat

## Summary Recap & Reconciliation
### 10/31/07

| Description: | Amount |
|---|---|
| Deposit to Vanguard (10/01/07) | $ 4,259,796.05 |
| Deposit to Vanguard (10/07/07) | $   498,369.44 |
| Total Vanguard Deposits | $ 4,758,165.49 |
| Vanguard interest earned | $    18,084.56 |
| Total Top Hat in Vanguard account | $ 4,776,250.05 |
| Wells Fargo - deposit  (deposited 9/28/07) | $   227,010.74 |
| **Total liability for Top Hat** | **$ 5,003,260.79** |

### RECONCILIATION

| | | |
|---|---|---|
| Top Hat Balance at 12/31/06 | | $ 4,736,227.37 |
| Total paid out from TransAmerica | $ 4,985,176.23 | |
| Less:  Balance at 12/31/06 | $(4,736,227.37) | |
| TransAmerica interest earned | | $   248,948.86 |
| Total amount of checks paid by TransAmerica | | $ 4,985,176.23 |
| Add:  Vanguard interest earned | | $    18,084.56 |
| **Top Hat Balance at 10/31/07** | | **$ 5,003,260.79** |

### Vanguard Check

| | |
|---|---|
| Total Top Hat in Vanguard account | $ 4,776,250.05 |
| Balance in Vanguard before Top Hat deposits | $      3,438.21 |
| Vanguard check - deposit new Top Hat Acct  *(Check # 13094167)* | $ 4,779,688.26 |

### Interest Income

| | |
|---|---|
| TransAmerica | $   248,948.86 |
| Vanguard | $    18,084.56 |
| Total interest income earned-to-date | $   267,033.42 |

# Top Hat

## Summary Recap & Reconciliation
### 10/31/07

**Adjusting Journal Entries:**

| Sub-code | Account description | GL Acct# | Debit | Credit |
|---|---|---|---|---|
| CORP | Top Hat Investment | 1100085 | $ 267,033.42 | |
| CORP | Deferred compensation plan payable | 2610100 | | $ 267,033.42 |
| | *(to record interest earned on investment 1/1/07 thru 10/31/07)* | | | |
| | | | | |
| CORP | Payable - payroll taxes | 2100003 | $ 227,010.74 | |
| CORP | Top Hat Investment | 1100085 | | $ 227,010.74 |
| | *(to reclass original deposit entry for Top Hat funds that were deposited into Wells Fargo. Entry incorrectly posted to "payable - payroll taxes" account.)* | | | |
| | | | | |
| CORP | Vanguard Investment | 1760153 | $ 4,776,250.05 | |
| CORP | Top Hat Investment | 1100085 | | $ 4,776,250.05 |
| | *(to reclass funds for Top Hat from TransAmerica investment account to Vanguard investment account...balance reclassed includes interest earned ...reference JE-1007-1.)* | | | |
| | | | | |
| CORP | Vanguard investment | 1760153 | $ 43.16 | |
| CORP | Interest income | 3300110 | | 43.16 |
| | *(to record interest income on Vanguard investment thru 9/30/07 before Top Hat transfer of funds..deposits)* | | | |

| Description | Vanguard Investment (Top Hat) 1760153 | Top Hat Investment 1100085 | Deferred Comp (Top Hat) 2610100 |
|---|---|---|---|
| Bal. before AJE's | $ 3,395.05 | $ 4,736,227.37 | $ 4,736,227.37 |
| JE-1007-1 | $ - | $ 267,033.42 | $ 267,033.42 |
| JE-1007-2 | | $ (227,010.74) | |
| JE-1007-3 | $ 4,776,250.05 | $(4,776,250.05) | |
| JE-1007-4 | $ 43.16 | | |
| | | | |
| Ending 10/31/07 Bal. after AJE's | $ 4,779,688.26 | $ - | $ 5,003,260.79 |

<u>Note:</u> Check #13094167 from Vanguard, dated 11/02/07, was sent via overnight delivery to CLI. Check rec'd Mon 11/5/07 and deposited into new segregated Top Hat Account.. Check was in the amount of $4,779,688.26.